THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ELMER SAYLOR *et al.* Plaintiffs in Error.

*Opinion filed December 16, 1925.*

1. CRIMINAL LAW—*castration is punishable as mayhem under the Criminal Code.* Castration is punishable as mayhem under the provision of the Criminal Code making it a felony to remove or disable any limb or member of any person with the malicious intent to maim or disfigure him.

2. SAME—*when an instruction as to presumption of sanity is erroneous.* In a prosecution where insanity is the defense, an instruction "that every person accused of crime is presumed to be sane until the contrary is shown" is erroneous, as the only effect of the presumption of sanity is to require the introduction of evidence tending to prove insanity, and when that is done the presumption no longer prevails and cannot be considered by the jury in determining whether the defendant is sane or insane.

3. SAME—*when burden is upon State to prove sanity.* The burden is never upon the defendant to prove himself insane where that is the defense but all that is required of him is evidence sufficient to raise a reasonable doubt of sanity, and whenever evidence is introduced tending to show that the defendant was insane at the time of committing the act charged as a crime, the burden devolves upon the State to prove beyond a reasonable doubt, regardless of the presumption of sanity, that at the time of the commission of the act the defendant was sane.

4. SAME—*accused is entitled to a fair and orderly trial.* Conviction should be the result of a fair trial and not of the conclusion which a court of review may reach from a consideration of the evidence contained in the record where there has not been a fair trial, and although the evidence may be sufficient to sustain a conviction the judgment will not be affirmed merely because counsel on both sides have been guilty of misconduct, where such misconduct of counsel, together with laxity of the court, has resulted in an irregular, disorderly and unfair trial.

5. SAME—*State's attorney must see that defendant has fair trial.* The State's attorney is a sworn officer of the court, and it is his official duty to see that the defendant has a fair and impartial trial.

6. SAME—*it is the duty of the court to compel orderly trial.* A judge presiding over a trial has power to compel decorum in his court room, and it is his duty to see that the proceedings are conducted in such a manner as will inspire respect for law and the administration of justice.

WRIT OF ERROR to the Appellate Court for the Second District;—heard in that court on writ of error to the Circuit Court of Rock Island county; the Hon. WILLIAM T. CHURCH, Judge, presiding.

KENWORTHY, DIETZ, SHALLBERG, HARPER & SINNETT, and P. R. INGELSON, (CYRUS E. DIETZ, and J. J. NEIGER, of counsel,) for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, BENJAMIN S. BELL, State's Attorney, and MERRILL F. WEHMHOFF, (EDWARD L. EAGLE, of counsel,) for the People.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

Elmer Saylor, Leonard Saylor and Earl Saylor, together with Grace Saylor, the wife of Elmer, were indicted in the circuit court of Rock Island county for mayhem. Upon a trial Grace was found not guilty, but the three men, who are brothers, were found guilty, and the court entered judgment sentencing each of them to imprisonment in the penitentiary for not more than twenty years nor less than one year. The defendants prosecuted a writ of error to the Appellate Court, which affirmed the judgment, and they have sued out a writ of error from this court.

There were three counts in the indictment, which the plaintiffs in error moved to quash. The motion was sustained as to the first count but overruled as to the other two, and it is argued that it was error to deny the motion to quash the second and third counts. Those counts charged that the defendants on October 24, 1923, made an assault upon Mark Pendleton with the malicious intent to maim and disfigure him, the second count charging that with such intent they cut off and disabled a part of his organs of generation, and the third count that with the same intent they mutilated and disabled his testicles.

The plaintiffs in error contend that castration is not within the terms of the statute. Mayhem by castration seems always to have been a felony at common law. (4 Blackstone's Com. 206.) By the Coventry act (22 and 23 Car. II, chap. 1,) it was enacted that "if any person shall, of malice aforethought and by lying in wait, unlawfully cut out or disable the tongue, put out an eye, slit the nose, cut off a nose or lip, or cut off or disable any limb or member of any other person with intent to maim or disfigure him, such person, his counselors, aiders and abettors, shall be guilty of felony without benefit of clergy." Paragraph 448 of our Criminal Code is, that "whoever, with malicious intent to maim or disfigure, cuts or maims the tongue, puts out or destroys an eye, cuts or tears off an ear, cuts, slits or mutilates the nose or lip, cuts off or disables a limb or other member of another person, shall be imprisoned in the penitentiary not less than one nor more than twenty years, or fined not exceeding $1000, and confined in the county jail not exceeding one year." This does not vary in any substantial way from the English act. It is not ambiguous and there seems to be no room for construction. The statute is directed against the removal or disabling of any limb or member of any person with the malicious intent to maim or disfigure him. There can be no question that the testicles are members of a man and that their removal maims and disfigures him. The motion to quash the second and third counts was properly overruled.

The evidence shows that the act charged was committed. Pendleton testified that it was done by Elmer, Leonard and Grace; that he went with Elmer and Leonard in an automobile to Elmer's home, and in the barnyard Elmer, who was in the back seat of the automobile, struck him over the head with a bottle; that Grace came from the house and struck him with a club; that he was dazed and Leonard and Grace tied him while Elmer cut out his testicles. Elmer testified but did not deny that he did the

act. He claimed that he had no recollection of it, and his defense was that his action was the result of an insane impulse brought on by his belief that Pendleton had drugged his wife, Grace, and ravished her, and that Pendleton was diseased with syphilis and gonorrhea.

Leonard testified that he was employed at the Moline Body Corporation in Moline and was at work there on October 24 when Elmer came there. Elmer was incoherent, apparently, talked unintelligibly and seemed unconscious of what was going on around him. Leonard had not heard of any trouble between Pendleton and Elmer but gathered from Elmer's incoherent words that Pendleton had interfered with Elmer's family. Elmer was in the shop only two or three minutes, when he rushed off. Leonard, from his actions and appearance, feared that he was out of his head, crazy, and that he might do Pendleton some harm, and ran outside the shop to follow him. He did not see him anywhere, but some workmen who had seen Elmer go told Leonard the direction in which he had gone. Leonard followed and eventually saw his brother, who was in his automobile, drive up in front of John W. Beamer's house and stop. He ran up there and found Elmer talking over the telephone. Elmer came out and jumped into his car. Leonard had no time to say anything but got in the car with him. He asked Elmer where he was going, but Elmer did not answer. He then asked what he was going to do, and Elmer said, "I have got to see Pendleton." By that time he had got down to First street and stopped in front of a garage. He jumped out and ran to the door of the garage and Leonard got out on the other side. By the time Leonard got to the garage Elmer had gone in and he and Pendleton were coming out. The only conversation that he heard was that Elmer said something to Pendleton about going up to "Shorty's," and Pendleton asked Elmer if he called Shorty up, and Elmer said "yes." Leonard did not know who Shorty was. They all then got into the car,

Pendleton and Elmer in the front seat and Leonard behind.
Leonard did not know where they were going, but when
they got out to Forty-eighth street, near where his brother
lived, Elmer said, "I have got to run in home and get some
jugs." He then turned north on Forty-eighth street, and
as they came to the house he asked Leonard to go in the
barn and get some jugs which were under the straw in the
barn. Leonard got out about one hundred feet from the
barn before the car had stopped. At that time nothing had
occurred between Pendleton and Elmer. When he got out
of the car he saw Grace in the yard one hundred feet or
more away, raking and burning leaves. He went to the
barn, spent four or five minutes looking for the jugs, and
when he got them he walked back to the car. Elmer was
on one side of the car, Grace on the other and Pendleton
was on the front seat. He seemed dazed and had a cut
on the side of his head. He asked Elmer what he had
done to Pendleton and Elmer made no answer. Elmer
and Leonard got in the car with Pendleton and drove back
to Beamer's. Leonard said that he did not strike Pendle-
ton or help tie him or have anything to do with the assault
and did not know of it at the time it was committed; that
he knew when he saw Elmer at the Moline Body Corpora-
tion that he was greatly excited and very angry at Pendle-
ton, and he feared that Elmer might kill Pendleton and
went with him to prevent it. Grace did not testify.

Earl was not present when the act was done but was
at his house, several miles away. The testimony connecting
him with the crime was given by Beamer, who testified that
in the spring of 1923 he went into partnership with Elmer
in the making of whiskey and they employed Pendleton in
that business. Elmer's family and Beamer's family and
Pendleton all lived at Elmer's house until August 14, when
Beamer and his family and Pendleton moved into another
house. The partnership continued until the commission of
the crime. On October 24 Beamer and Pendleton were on

319—14

familiar terms with Earl and his wife. In the morning of
that day Elmer and Beamer drove to Earl's house and had
a controversy there in which Earl's wife, Zora, was in-
volved. A fight between Elmer and Beamer was prevented
by Earl. Elmer left, saying he was going to get Pendle-
ton and kill him or cut him, and told Earl to watch Beamer,
and if Beamer moved, to blow his brains out. Beamer tes-
tified that he had no opportunity to leave when Elmer did
or afterward, because he was afraid of Earl and what he
would do with a gun which Earl had in the house. Elmer
returned later and reported what he had done to Pendleton,
and Earl shook hands with him, saying, "I am for you,
old boy," gave him the shotgun and told him to kill the
first one who bothered him. Beamer advised Elmer against
this. Earl denied that Beamer was under any sort of com-
pulsion to stay at his house, denied that he had any shells
for the gun that was there, and said that Beamer might
have left any time if he had wanted to; that for fifteen
minutes Earl was out of the house talking with a collector
who came to collect a bill, and in this he is corroborated
by the collector and her son. Beamer testified that Elmer
said to him after he returned, that if Beamer ever told of
what he had done Elmer would kill him, and if he got thirty
years he would still kill him when he got out, and Earl
said, "If one don't the other will." The conviction, so far
as Earl is concerned, depends upon Beamer's testimony, and
his testimony shows that Beamer is a depraved person of
a low grade of morals, of criminal instincts, with no re-
spect for law or regard for decency.

Elmer testified on the trial that his suspicions of Pen-
dleton in connection with Elmer's wife were aroused by a
conversation which he had with Beamer, and related his
growing conviction of the truth of his suspicions, the final
verification of them, his belief that Pendleton was diseased,
and that he hated Grace and had drugged her and taken
advantage of her as a means of revenge. He described his

increasing hysterical excitement and nervous agitation, his inability to eat or sleep to such an extent that he was hardly conscious of his surroundings and his memory of events was lost. The workmen at the body factory who saw Elmer and testified thought he was insane. His eyes were bulged, his face pale, his manner unusual. It was shown that an aunt and a sister had been insane for many years. Alienists testified for the defense, in answer to hypothetical questions, that in their judgment Elmer was insane at the time the crime was committed. Other alienists, in answer to hypothetical questions, testified for the People that in their judgment he was not insane. There was evidence which would have sustained a verdict either way.

It is contended that the court erred in giving the following instruction:

"The court instructs the jury that every person accused of crime is presumed to be sane until the contrary is shown. If no evidence of insanity had been given, then under this presumption it is your duty to presume the defendant, Elmer Saylor, to be responsible for his acts. The court further instructs you that when evidence is introduced upon the question of insanity then the question of whether or not the defendant is criminally responsible for his act, that is, the question whether he was so insane, or whether his reason was so obliterated, that he was incapable of distinguishing right from wrong, or incapable of choosing between right and wrong, becomes a question for you, the jury, to determine from all the evidence bearing upon it."

This instruction is erroneous. The law does not presume every person accused of crime to be sane until the contrary is shown. The only effect of the presumption of sanity is to require the introduction of evidence tending to prove insanity. When that is done the presumption no longer prevails. It does not continue until the contrary is shown. The question of sanity or insanity is then to be determined from the whole evidence, without any reference

to the presumption. The rule as stated in the instruction in effect imposes the burden of proof on the defendant. It is not essential that insanity should be shown. All that is required of the defendant is evidence sufficient to raise a reasonable doubt of sanity. The presumption of sanity can not be considered by the jury in determining whether the defendant is sane or insane. Whenever evidence is introduced tending to show that the accused was insane at the time of committing the act charged as a crime, the burden devolves upon the State to prove beyond a reasonable doubt, regardless of the presumption, that at the time of the commission of the act the accused was sane. (*People* v. *Cochran,* 313 Ill. 508.) As said in that case: "An instruction to the jury as to what the presumption of law is, upon a question of disputed fact, is extremely likely to mislead the jury and should not be given." In view of all of the evidence the judgment must be reversed as to Elmer Saylor for the giving of this instruction. It placed upon him a greater burden of proof than the law imposed.

The plaintiffs in error contend that they did not receive a fair trial because of the improper conduct of the State's attorney and his assistant, whose attitude toward the trial judge was so disrespectful and dictatorial as to discredit his decisions and instructions to the jury and bring about a disorderly and unfair trial, to the prejudice of the plaintiffs in error. The trial lasted three weeks and was vigorously contested by the attorneys on either side. The defense of insanity gave a wide range to the evidence, which revealed many immoral and revolting conditions involving all of the defendants, as well as Beamer and Pendleton. The State's attorney and his assistant were guilty of conduct toward the judge which he should not have tolerated. They refused to submit to rulings on the evidence, insisted on arguing their positions with the court, in the presence of the jury, after the court had decided, and assumed to lecture the court on his conduct of the trial. Many times during the trial

they thus offended against the proprieties that should prevail in a court of justice. ⌐ Such offenses were not confined to the prosecution. They were sometimes reprisals for actions and statements of counsel for the defense, who were guilty of like offenses and persisted· in offers of incompetent evidence which the court had excluded, many improper and intemperate remarks and accusations were made by the counsel on either side to one another, apparently not for the purpose of calling the court's attention to or asking its ruling on anything before the court but to make some impression on the jury. While counsel for the People were offenders, counsel for the plaintiffs in error kept equal pace with them, and the failure of the presiding judge effectually to assert his authority resulted in a quarrelsome, brawling contention before the jury inconsistent with the serious deliberation which should characterize the proceedings of a judicial trial.⸗}

While there is no doubt that the act charged was committed by Elmer, the evidence was conflicting on the question of his criminal responsibility, and the evidence as to the guilt of the other two plaintiffs in error depends upon the question of the credibility of Beamer and Pendleton, who testified against them. The plaintiffs in error were entitled to a fair trial by the jury, uninfluenced by recriminations of counsel and claims of unfairness and prejudice on the part of the judge, and where they have not had such a trial it is not for the court to say that they were properly convicted because they were guilty. Conviction should be the result of a fair trial and not of the conclusions which a court of review may reach from a consideration of the evidence contained in the record where there has not been a fair trial. "Although there may be enough evidence in a record to justify a conviction, a defendant has a right to a trial by jury and not by this court. He has a right to be tried in accordance with the law of the land, and a conviction secured in total disregard of that law cannot be sustained." (*People*

v. *Garines,* 314 Ill. 413.) The State's attorney is a sworn officer of the court and it is his official duty to see that the defendant has a fair and impartial trial. (*People* v. *Bimbo,* 314 Ill. 449; *People* v. *Kawoleski,* 313 id. 257.) In the latter case it was said: "Whatever may be said of the sufficiency of the evidence to warrant the verdict, we think the public effect of affirming the judgment would be more serious in its consequences than a reversal of the judgment and remandment of the case for a new trial."

The court should have exercised its authority during the trial to prevent successive repetitions by counsel on either side of their contemptuous conduct. One offense might perhaps be overlooked with no more than a rebuke, but the second should have met prompt punishment. A judge presiding over a trial has power to compel decorum in his court room, and it is his duty to see that the proceedings are conducted in such a manner as will inspire respect for law and the administration of justice. The Appellate Court stated that many improper remarks were made by the State's attorney and his assistant which could not be approved, "and if this misconduct had been confined to that side alone, we would deem it our duty to reverse the judgment." We do not agree with this view of the record, and we are not willing to affirm a judgment based upon such an irregular, disorderly and turbulent proceeding as the record shows this trial to have been. Our view is expressed in the language used in *People* v. *Lewis,* 313 Ill. 312, that the only fair treatment of the record is a reversal of the judgment so that a fair and orderly trial may be had under the law.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*