(No. 34135.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ROLAND MUNROE, JR., Plaintiff in Error.

*Opinion filed November 26, 1958.*

PRENTICE H. MARSHALL, of Chicago, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and BENJAMIN S. ADAMOWSKI, State's Attorney, of Chicago, (FRANCIS X. RILEY and EDWIN A. STRUGALA, of counsel,) for the People.

Mr. JUSTICE KLINGBIEL delivered the opinion of the court:

In 1936 the plaintiff in error, Roland Munroe, Jr., fifteen years of age, was indicted and tried by jury in the criminal court of Cook County for the crime of murder. His defense was that he was insane at the time he committed the act with which he was charged. The jury returned a verdict of guilty on October 21, 1936, and fixed his punishment at 199 years in the penitentiary. On November 19, 1936, after denial of his post-trial motions, judgment was entered on the verdict and sentence was imposed. Appearing *pro se,* he thereafter obtained a timely issuance of a writ of error to review the conviction on the basis of the common-law record only. This court then appointed counsel to represent him. Thereafter counsel obtained a transcript of the trial proceedings under Rule 65—1 of this court (Ill. Rev. Stat. 1957, chap. 110, par.

101:65—1); and on February 11, 1958, while the original writ of error was pending, an application was filed in this court for a writ of error under Rule 65—1. At the May, 1958, term this court granted the application and ordered the two causes consolidated. To reverse the conviction plaintiff in error, hereinafter called defendant, contends that the court erred in instructing the jury and that improper and prejudicial remarks were made by the prosecutor in his closing argument.

At the outset it is necessary to consider a motion by the State in the nature of a plea of limitations. It is argued that the second writ of error, allowed upon the petition under Rule 65—1, is barred and should be quashed because issued more than twenty years after defendant's conviction; that the bill of exceptions is therefore not properly before the court; and that the alleged errors in the giving of instructions and the making of prejudicial arguments to the jury cannot be considered.

It is well settled that the common-law limitation of 20 years applies to writs of error in criminal cases. (*People* v. *Hartfield*, 11 Ill.2d 300.) Where it appears upon the face of the record that a writ of error is issued more than 20 years after the entry of the judgment, a plea of limitation filed by the defendant in error will be sustained. (*People* v. *Chapman*, 392 Ill. 168.) In the case at bar, however, the writ of error was first sued out by defendant before expiration of such period, and has not since been dismissed or otherwise disposed of. The transcript of the trial proceedings obtained pursuant to Rule 65—1 is an additional record, reviewable by the original writ of error, as well as by the writ of error granted on the petition filed under Rule 65—1.

*People* v. *Hartfield*, 11 Ill.2d 300, relied upon by the State, is distinguishable. In that case the plaintiff in error contended the limitation was inapplicable because a former writ of error, dismissed prior to suing out the writ of error in question, was within the 20-year period. In re-

jecting the contention this court said "His first writ of error was dismissed and the present writ of error is in no sense a continuation of the first one, but is an entirely separate proceeding." In the case at bar the writ of error, originally sued out within the 20-year period, was pending when petition for writ of error under Rule 65—1 was granted. It follows that the plea of limitation must be denied.

The evidence discloses that at seven o'clock on the night of Saturday, August 29, 1936, the defendant, a fifteen-year-old Chicago newspaper boy, called at the apartment of one Agnes Roffies, 66 years of age, to collect his weekly payment for newspapers. It was a hot night and Mrs. Roffies invited defendant into her home for a cold drink. They sat in her living room taking the drink together and visiting. At about 7:30 a grocery delivery boy called at Mrs. Roffies' apartment, with her weekly delivery of food stuffs. The defendant answered the grocery boy's call at the door. After the grocery boy had gone Mrs. Roffies asked the defendant if he would straighten a back-door key which she had bent. He agreed to do so and she gave him a small tack hammer with which he straightened the key by pounding it on a kitchen table. Then defendant returned to the living room, carrying the hammer with him.

From his position in the living room he saw Mrs. Roffies place a box on the dining room table. He knew, from a conversation with her a week earlier, that the box contained some feminine trinkets, jewelry, buttons and old gold of little or no value. She then entered the living room where defendant was seated. She sat down for a moment opposite him, then rose and walked toward him. As she approached she stumbled and fell, whereupon defendant struck her on the head with the tack hammer. When the handle of the hammer broke, defendant seized Mrs. Roffies' cane and bludgeoned her to death with it. He thereafter went to the dining room and took the box. He left the

apartment through the front door, took the jewelry and trinkets to an old gold dealer with whom he left them for safe keeping until morning, returned to his home and went to bed. When the attack occurred the lights were on and the window shades up. Three passers by on the darkened street outside heard Mrs. Roffies scream and observed defendant in the act of striking her. Before morning he was arrested at his home and shortly thereafter admitted the killing.

Evidence on the issue of insanity reveals that from infancy defendant had been highly nervous and unstable. He was afflicted with a nervous disorder known as St. Vitus Dance, and at the age of three was taken to a psychiatrist who advised the father that the boy was not right mentally. He was then given treatment for about a year. At six years of age he was taken to a psychoanalyst at the University of Minnesota Child Clinic. His mother, who died when he was about twelve years old, fancied herself a spiritualist and believed she was going to become a great medium. She heard voices and gazed into a crystall ball. Defendant did not associate with other children, and from the time of his birth displayed extreme antisocial tendencies. When he was thirteen years of age he had become a confirmed homosexual. The men with whom he engaged in homosexual practices paid him for his consent, and he devoted the money to purchases of perfume and feminine jewelry. Shortly before the attack on Mrs. Roffies, the defendant had been taken to the Institute of Juvenile Research, where he was examined as an emergency case.

Defendant's father testified that the only time he could remember his son crying was an occasion when he lost a card game with his parents; that he then went into a frenzy and cried continuously for fifteen minutes; that the boy would spend all his money on feminine trinkets which he valued highly; that he was always putting curls in his hair and primping himself; that at every opportunity he

would obtain bottles of perfume which he would conceal about the house and that at the time of his arrest there were about ten bottles of it hidden in his room. On the basis of his observations of such abnormal behavior the witness expressed the opinion that his son was insane on and prior to August 29, 1936.

An osteopath and chiropractor testified that he had formerly been a nurse in an insane asylum and had frequent contact with the patients; that he first met defendant in the spring of 1936, when the latter began attending Sunday School classes conducted by the witness; that he had occasion to see defendant many times during the following three months, and observed peculiar behavior on his part; that defendant would never answer questions directly but would talk about unrelated and nonsensical things; and that in the opinion of the witness, based upon his observations of defendant, the latter was an idiot on August 29, 1936. In addition, the family housekeeper and a friend of hers who had observed defendant frequently on her visits to the home, testified to various characteristics and instances of abnormal behavior of defendant, and expressed their opinions that he was not sane on August 29, 1936.

In rebuttal the State called two psychiatrists and an assistant State's Attorney. The first psychiatrist testified that on the basis of examinations during the months of September and October, 1936, he found defendant to be a sane person on August 29, 1936, although he characterized him as a psychopathic personality, a sexual psychopath, a homosexual and a moral imbecile. The second psychiatrist stated that he first saw defendant on August 21, 1936, when he examined him professionally; that he made a report to the superintendent of the Institute for Juvenile Research, who sent a report to defendant's stepmother on September 1, which was after the homicide of August 29, 1936; that the report was delayed because studies on the boy had not been completed; and that in the opinion of the witness

defendant was mentally normal on August 29, 1936. The witness declined to express an opinion as to defendant's sanity or insanity because he deemed those terms to represent social or legal concepts rather than medical ones. The assistant State's Attorney testified that he had been present on an occasion about three weeks after the killing, when defendant was questioned for some fifteen minutes, and that in the witness's opinion, based upon defendant's answers to the questions, he was sane on August 29, 1936.

While we have not attempted to set forth in detail the testimony on this issue, we have examined it carefully and think there is evidence which would have sustained a verdict either way. The sole defense was that of insanity. The peculiarity of defendant's behavior, his history of mental sickness and the senseless nature of the killing lend support to the claim that there is a substantial conflict in the evidence thereon. Under such circumstances it is essential that the jury be accurately instructed as to the law and that the record be free from prejudicial error. *People* v. *Pruszewski,* 414 Ill. 409; *People* v. *Cochran,* 313 Ill. 508.

Defendant complains of error in the giving and refusal of instructions. Over his objection the court twice instructed the jury that a person is presumed sane until the contrary is shown. The giving of such instructions was improper under the circumstances of this case. The presumption of sanity is not evidence of sanity and cannot be treated as such by a jury in reaching a verdict. Its only effect is to require the introduction of evidence tending to prove insanity. When that is done, as in this case, the presumption no longer prevails. The burden then devolves upon the State to prove beyond a reasonable doubt, by evidence, that at the time of committing the act the accused had sufficient mentality to distinguish between right and wrong as to the particular act, and that he was capable of exercising the power to choose between the right and the wrong. The presumption of sanity cannot be considered

by the jury in determining whether this burden has been satisfied; and an instruction as to what the presumption is tends to mislead the jury. It should not be given. *People* v. *Saylor*, 319 Ill. 205; *People* v. *Cochran*, 313 Ill. 508.

The court also told the jury that "in order to find the defendant not guilty on a ground of insanity, such insanity must be so clearly proven as to raise a reasonable and well-founded doubt of defendant's guilt when the whole evidence is taken together." Similar instructions in almost identical language, have been condemned by this court in *People* v. *Skeoch*, 408 Ill. 276, *People* v. *Krauser*, 315 Ill. 485, 516, and *People* v. *Cochran*, 313 Ill. 508, 524, on the ground that they erroneously cast the burden of proving insanity upon the accused. To justify the jury in finding him not guilty, it is not necessary that insanity should be proved "clearly" or even by a preponderance of the evidence. It is only necessary that there be evidence tending to prove insanity sufficient, in connection with all the evidence, to raise a reasonable doubt of guilt. Use of the word "well-founded" in connection with reasonable doubt was also erroneous. If a reasonable doubt actually exists it is sufficient, whether well or ill-founded. *People* v. *Krauser*, 315 Ill. 485, 517.

Likewise objectionable was an instruction which told the jury, *inter alia*, that to justify an acquittal "unsoundness of mind, or affliction of insanity, must be of such a degree as to create an uncontrollable impulse to do the act charged by overriding the reason and judgment and obliterating the sense of right or wrong as to the particular act done and depriving the accused of the power of choosing between right and wrong." The giving of an instruction identical in language to the present one was held to constitute error in *People* v. *Moor*, 355 Ill. 393, 399, and *People* v. *Krauser*, 315 Ill. 485, 512-514. (Cf. *People* v. *Carpenter*, 11 Ill.2d 60.) The vice in the instruction is that, to constitute a defense on the ground of insanity, it requires that defendant lack not only the ability to distinguish

between right and wrong but also the power to choose between them and act accordingly. The ability to judge and the power to choose are both necessary to criminal responsibility, and the absence of either will justify a verdict of not guilty. If it appears that either the knowledge of right and wrong or the ability to choose between them is lacking, the accused cannot be convicted of the offense charged.

Also urged as error is the giving of an instruction which ignored the defense of insanity and informed the jury that defendant's confession may be sufficient to warrant a conviction if they were satisfied beyond a reasonable doubt that the crime had been committed and that the confession is voluntary and true. This court has repeatedly condemned instructions, in cases such as this, which ignore the defense of insanity. (*People* v. *Moor*, 355 Ill. 393, 400; *People* v. *Krauser*, 315 Ill. 485, 514-516; *People* v. *Penman*, 271 Ill. 82, 96-97.) It would serve no useful purpose to further comment upon them here.

The State does not dispute the impropriety of the instructions complained of by defendant, but urges that the errors should not be reviewed by this court because it does not appear on whose behalf the particular instructions were tendered. The record discloses, however, that defendant objected to them in the trial court; and we think that under the circumstances of this case he is entitled to have his contentions considered on their merits.

Since the evidence of defendant's mental capacity was in conflict, it was essential that the jury be properly instructed. For the errors indicated the judgment of the criminal court of Cook County will be reversed and the cause remanded for a new trial.

*Reversed and remanded.*