(No. 36697.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, v. WILLIE C. CHILDS, Plaintiff in Error.

*Opinion filed March 30, 1972.*

UNDERWOOD, C.J., and RYAN, J., dissenting.

HELMUT EIFERT, of Chicago, for plaintiff in error.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and ROBERT A. NOVELLE and ARTHUR L. BELKIND, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

Willie C. Childs, the defendant, was tried in 1957 for the murder of Matt Hairston, which occurred on July 25, 1956. A jury in the circuit court of Cook County found him guilty, and he was sentenced to imprisonment for life. The case has been brought to this court upon a writ of error under Rule 602 (Ill.Rev.Stat. 1969, ch. 110A, par. 602), which provides that the review of judgments entered prior to January 1, 1964, shall be governed by the time limitations and procedures in effect on December 31, 1963. The steps taken in this case conform to those limitations and procedures.

The defendant's contentions center upon his mental condition, both as it related to his competence to stand trial and to his sanity at the time of the alleged offense. Our discussion will be confined to the latter issue. A statement of the testimony at the trial is necessary.

Sarah Hairston testified that she had been married to Matt Hairston from 1934 until July 25, 1956, the date of his death. She had met the defendant, Willie Childs, in 1955 when she was employed at Creedmore Hospital, a mental institution in New York, and the defendant was a patient there. She testified that she had an extra-marital affair with Childs after his escape from that hospital in November of 1955. In late April or early May of 1956 she traveled to Georgia with Childs to visit some relatives of his. Thereafter, she traveled to Cleveland, Ohio, with him. On June 18, 1956, she left for Chicago without telling Childs. In early July she accidentally met the defendant in Chicago. She testified that although she rejected his advances, he followed her constantly during July.

Matt Hairston had also come to Chicago in early July, 1956, she stated, and he and the defendant met once during this interval and had a brief conversation at which no animosity was shown by either of them. She also testified that on July 22, 1956, the defendant had rebuked her for refusing to go away with him. After that she met her husband and on July 24 they went to stay at the home of a Reverend Daniels, the pastor of the church Sarah attended.

On the night of July 24, 1956, she and her husband were at the Daniels' apartment, which was on the fourth floor. She testified that the Reverend Daniels had to leave but she and her husband talked to Mrs. Daniels, his wife, until 3:00 o'clock in the morning of July 25. The Hairstons were asleep on a studio couch in the living room of the Daniels' apartment when they heard a knock on the front door. Mrs. Daniels went to the door, but Sarah

indicated to her that she shouldn't open the door, after she recognized the voice of the caller as that of Willie Childs. According to Sarah's testimony, the defendant became enraged when Mrs. Daniels refused to let him into the apartment and he said, "I kill all of you sons of bitches in there." He then started to beat against the front door and Mrs. Daniels, Sarah and Matt Hairston took refuge in the bathroom. Mrs. Daniels opened the bathroom window a few inches and began to call for help.

The defendant entered the apartment, pushed in the bathroom door, and began to hit both Sarah and Matt Hairston. Sarah hit Childs with a bottle, and then he threw her out of the bathroom and onto the kitchen floor. While lying there she saw him go toward the bathroom window, and she heard the window scraping as it was opened wider. She then saw him dragging her husband by the shoulders from the bathtub, where he had been standing, toward the window. The defendant then came from the bathroom, hit Sarah and dragged her down four flights of stairs. Although she was completely naked at this time, he dragged her out of the house, and she saw the body of her husband lying on the pavement. The defendant then dragged her farther away from the house and began to beat her again. At this time the police arrived and took him into custody.

On cross-examination Mrs. Hairston made several statements relating to the mental state of the defendant. She said that after his escape from Creedmore Hospital, a doctor at the hospital told her that they didn't want him there anymore. She stated that a discharge from the hospital had been approved for him, but that the defendant told her he had not waited for the discharge because if he had been discharged he would have to "face the D.A." She also said that there was nothing wrong with the defendant mentally, that he had told her that he had pulled a "mental trick" while in the army and then had

gotten himself admitted to the hospital in order to receive additional money from the government.

On cross-examination Mrs. Hairston admitted that at the coroner's inquest she testified that she hadn't realized that it was her husband lying outside of the house and that the events of that night were not clear in her mind. She also said that her husband, Matt, had previously threatened to kill both her and himself. Additionally, the defense called Police Officer Lemon Works who testified that in a statement made by Sarah Hairston shortly after the events on July 25, she did not mention that the defendant dragged her husband at all and she stated that she didn't remember much of the events.

Mrs. Carrie Daniels testified that she was the sister-in-law of the Reverend Leon Daniels and lived in the apartment across the hall from him. About 3:15 P.M. on July 25, 1956, she was awakened by someone knocking on the door of the Reverend Daniels' apartment. She heard Willie Childs make the statement testified to by Sarah Hairston, and she later saw Childs pulling Sarah Hairston down the stairs of the building. Sarah was naked at that time. On cross-examination she stated that she had met the defendant the Sunday before July 25, 1956, when he came to the Daniels' apartment. She told him that the Reverend Daniels was out and that he would have to reach him after 12:00 o'clock when he usually came home after church services. She said that he acted strange "to an extent" at that time.

Leon Daniels testified that he was a minister, and that he met the defendant on July 24, 1956, and that the defendant told him that he had intended to kill him the night before but that he was "stopped in his tracks." The defendant also told him that he was knocked out in the street and that he had been taken to a hospital. On cross-examination Reverend Daniels stated that in a telephone conversation the defendant said that God had

stopped him in his tracks when he was on his way to kill him, and that God had knocked him out.

Beulah Daniels, the wife of Reverend Leon Daniels, testified, and her testimony corroborated that of Sarah Hairston as to the events at the Daniels apartment on the morning of July 25, up to the time that Childs entered the bathroom. She ran from the room at that time. After that she saw Childs dragging Mrs. Hairston down the stairs. On cross-examination she testified that prior to July 25 she and her husband went to a hospital to identify the defendant, who had been taken there when he had been found on a street "foaming at the mouth." After that the defendant told her and her husband about being stopped in his tracks by God.

Clyde Newsome was called as a witness by the defense. He stated that prior to July 25, 1956, he had rented a room to the defendant and that Sarah Hairston had visited him there. Jane Newsome, his wife, also was called by the defense, and testified to substantially the same events. She also stated that she had never seen Childs acting "strange."

Dr. William H. Haines was called as a witness on behalf of the defense. Dr. Haines was a physician who had specialized in nervous and mental diseases and who had examined the defendant in October, 1956, and January, 1957, pursuant to an order of the court. He testified that at the Creedmore State Hospital in New York the defendant was diagnosed as suffering from "dementia praecox, paranoid type," which is a mental disease characterized by disassociation of ideas, emotions and motor activities. He stated that the defendant was capable of understanding the nature of the charge and able to cooperate with counsel, as he had testified at the earlier hearing on the defendant's competence to stand trial. He also stated that the defendant had auditory hallucinations when he was admitted to Kings County Hospital in New

York. In addition, defendant had exhibited impulsive behavior in the past. Dr. Haines also stated that the defendant was diagnosed as having a psychosis with psychopathic personality when he was at Creedmore Hospital.

On cross-examination Dr. Haines stated that sanity was a synonym for responsibility, and that a person acted sanely when he had the power to choose and still did an act knowing it was wrong. He then stated that the defendant would be classified as sane. He also testified that the defendant had said that he had an urge to kill people when he was at Creedmore Hospital.

Dr. Haines also testified that dementia praecox was the same as schizophrenia but that this didn't necessarily classify one as legally sane or insane. He said that a person with a psychopathic personality would be more liable to act due to an irresistible passion. It was his opinion that the defendant was sane during the month of July, 1956. During a continued redirect examination he stated that nothing he knew or observed about the defendant gave any evidence that the defendant was malingering, or fabricating a mental disorder.

The defendant then testified that he had been imprisoned in Georgia and had gone to New York after escaping from a Georgia chain gang. He met Sarah Hairston in 1951 and began to have an affair with her shortly thereafter.

He testified that when he was serving in the armed forces he had fallen from a truck, which resulted in his suffering from constant headaches and blackouts, and that he "used to get very depressed at times." He went to a Veterans Administration Hospital, where he had a complete nervous breakdown. He was taken to the Creedmore State Hospital "in a straight jacket", where he was a violent patient and had to receive a number of shock treatments. He testified that Mrs. Hairston got a job at

Creedmore in order to be with him, and they continued to have sexual relations during his stay there. He escaped once in early 1953, but he returned to the hospital at the urging of Sarah Hairston. He testified that he had never been declared sane and dismissed from the hospital, and that he made his last excape from Creedmore in October, 1955.

He testified that after his excape he met Sarah in New York, and traveled with her to Georgia and Ohio. After she left him he discovered that she had gone to Chicago. He then came to Chicago and found her. Sarah was quite friendly to him at that time and stayed in a hotel with him for two days. Some time after that he blacked out on a street in Chicago and awoke in a hospital or clinic. He then called the Reverend Daniels, but he denied that he ever told the Reverend Daniels that he intended to kill him and that God had stopped him. He testified further that on July 24, 1956, he had called the Reverend Daniels in order to obtain money to leave Chicago. He also wanted a suitcase of his that Mrs. Hairston had at the Daniels' apartment.

He then related the events leading to the death of Matt Hairston. He went to the Daniels' apartment at 3:15 A.M. on July 25, 1956. He had gone there the day before but the Reverend's sister-in-law told him that he would have to wait until after midnight to see the Reverend. Mrs. Daniels answered the door and then he heard Sarah call out to Mrs. Daniels not to let him in. He then said that he wanted to speak to Sarah. Sarah had $135 which belonged to him. He broke through the front door and then pushed in the bathroom door. Sarah asked if he had gone crazy, and this upset him. According to his testimony he was arguing with Sarah when Matt Hairston cut him on the hand with a knife. He then hit Matt and knocked him down in the bathtub. Sarah told him to get out before Matt killed him.

According to the defendant's testimony, the bathroom window had been completely open when he entered the room. When he and Matt continued to fight, he hit Matt and Matt landed on the window sill in a sitting position. Sarah got between them, held Matt's right arm, and told him to drop the knife. The defendant then grabbed Sarah, and when she released Matt he "pinwheeled" out of the window. Thus, according to the defendant's testimony, Sarah was the last person to touch Matt Hairston before his fall. After Matt fell, the defendant and Sarah began to fight and Sarah hit him with a bottle. He grabbed her and pulled her down the stairs.

On cross-examination the defendant stated that he had been in mental institutions for all but five months during the period 1952 to 1955.

The defendant contends that his sanity at the time of the occurrence was not proved beyond a reasonable doubt at trial. We have set out the evidence bearing upon this contention at some length. There are many conflicts. Sarah testified that the defendant had told her that he fabricated his mental illness. The defendant denied this, and Dr. Haines testified that he found no reason to believe that the defendant had lied about his mental illness. Reverend Daniels and his wife testified to statements by the defendant that would reflect adversely upon his mental condition, but the defendant denied that he made those statements. It does appear from the Daniels' testimony and that of the defendant, that he became unconscious on the street and was taken to a hospital.

The defendant's testimony showed a history of confinement in mental institutions, but his recollection of his conduct on July 25, and of the reasons for that conduct was clear and lucid. Dr. Haines, the only expert witness, substantiated defendant's testimony concerning his history of mental illness and treatment, but Dr. Haines also testified that it was his opinion that the defendant was sane during July of 1956.

Once there is some evidence in a criminal case which raises a doubt as to the defendant's sanity at the time of the alleged offense, the prosecution must prove his sanity at that time beyond a reasonable doubt. In this case the issue of the defendant's sanity at the time of the alleged occurrence was clearly raised, and the evidence was conflicting. We turn, therefore, to a consideration of the instructions given to the jury.

Defense counsel tendered the following defense instructions numbers 6 and 7:

"(6) The Court instructs the jury that to warrant a conviction in this case, it is incumbent on the people to establish to the satisfaction of the jury, beyond a reasonable doubt, the existence of every element necessary to constitute the crime charged; and if, after a careful and impartial examination of all the evidence in the case bearing upon the question of sanity or insanity, the jury entertain any reasonable doubt of the guilt of the defendant, at the time of the alleged offense they should give the defendant the benefit of that doubt and acquit him.

(7) The Court instructs the jury, as a matter of law in this case, that in all criminal cases, before conviction can be had, the jury must be satisfied from the evidence, beyond a reasonable doubt, that the defendant is guilty in manner and form as charged in the indictment; and in order to sustain the defense of insanity it is not necessary that the insanity of the accused be established by a preponderance of the evidence. If, upon the whole evidence, they entertain a reasonable doubt as to the sanity of the accused, they must give him the benefit of such doubt and acquit him."

These two instructions were refused. The defendant's instruction number 8, which read as follows, was given:

"(8) The Court instructs the jury, that if you

believe from the evidence beyond a reasonable doubt that at the time of committing the alleged crime (if you believe from the evidence beyond a reasonable doubt that he did commit such crime) the defendant was able to distinguish right from wrong as to the particular act done and was able to choose between them and was able to control his action accordingly, then you can not acquit him on the ground of insanity."

The court also gave the State's instruction number 11, which is as follows:

"(11) The Court instructs the jury that a person is presumed to be sane until the contrary is shown."

These were the only instructions on insanity given to the jury. The conference on instructions indicates considerable confusion, with the prosecution strenuously arguing that there was no evidence to support the giving of any instruction on insanity. The only possible basis for such an assertion, which is repeated in this court, would seem to be a belief that psychiatric testimony is required in order to raise the issue of sanity. That, however, is not the case. (Wigmore on Evidence, 3rd ed., sec. 227.) During the conference the court stated that it was incumbent on both sides to instruct the jury on the law of insanity and that it was also incumbent upon the court to do so. But this was not done.

The two instructions which were refused were both approved by the then leading text on Illinois instructions. (1 Hemphill, Illinois Jury Instructions, secs. 2817, 2819.) The instructions that were given were, in our opinion, clearly inadequate in the circumstances of this case. The defendant's instruction number 8 failed to state the defendant's lack of criminal responsibility, if, as a result of mental disease or mental defect, he was unable to appreciate the criminality of his conduct. The instruction on the presumption of sanity, given at the request of the

State, has been characterized as "extremely likely to mislead the jury." (See *People v. Cochran (1924), 313 Ill. 508, 524;* see also *People v. Saylor (1925), 319 Ill. 205, 211-212; People v. Munroe (1958), 15 Ill.2d 91;* 1 Hemphill, Illinois Jury Instructions, sec. 2814; IPI Criminal sec. 25.00.) A presumption of sanity serves a valuable function in both civil and criminal litigation in preserving the energies of the parties and of the court from excursions into immaterial issues. As applied to mankind generally, it expresses a truth with sufficient accuracy for ordinary purposes. But as applied to the present case, the observation that the law "presumes every man to be sane" does not serve any useful purpose in terms of the conservation of the time and energy, nor does it reflect the experience of mankind. The evidence had put the issue of sanity before the jury, and the presumption could serve no administrative purpose. Human experience obviously would not warrant the assertion that one whose life for the preceding several years, except while he had escaped, had been spent in mental institutions, and one whose condition had been diagnosed as dementia praecox, paranoid type, could be presumed to be sane.

The judgment of the circuit court of Cook County is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

MR. CHIEF JUSTICE UNDERWOOD, dissenting:

I do not agree that it is necessary to remand this case for a new trial. In fact, it seems most unlikely that there is any real possibility of retrying in 1972 a murder case originally tried in 1957, some 15 years ago.

The only defenses presented in this case were self-defense and insanity. The claim that this killing occurred in self-defense is, in my judgment, frivolous as is any argument that it occurred by misadventure, leaving for consideration only the insanity defense which the jury rejected.

The majority holds that the jury was inadequately and

improperly instructed, a holding with which I simply cannot agree. The opinion does not mention the fact that a jury had found the defendant competent in a pretrial hearing. At trial the evidence supporting the contention that the defendant was legally insane consisted, in large measure, of his own testimony. Dr. Haines concluded that the defendant was legally sane at the time of the offense, and, contrary to the inference that arises from the majority's statement, the doctor substantiated the defendant's testimony concerning his mental illness and treatment only to a limited extent, there being no corroboration of defendant's testimony that he was admitted to the hospital in a strait jacket or that he received shock treatments while a patient. It is clear that the issue of legal culpability depended largely upon defendant's credibility in the eyes of the jury. That question was determined adversely to defendant, as is apparent from the jury's rejection of both his insanity and self-defense contentions.

The alleged insufficiency of defendant's instruction No. 8 was that it stated the applicable law in the negative. In my view the positive statement of law was clearly implied and furthermore this was defendant's own instruction and therefore provides no ground for complaint nor basis for reversal. (See dissenting opinion of Mr. Justice Ryan.) Additionally the inadequacy of this instruction could not have been cured by either of the refused instructions for they were relevant only as they attempted to indicate the State's burden of proof on the insanity issue. Those instructions might well have been given, but in view of the circumstances of this case, the refusal to do so was not, in my judgment, reversible error. The action of the trial court did not prevent the defendant from tendering an accurate instruction on the law of insanity which was in fact read to the defense counsel by the trial judge during the conference on instructions, but which defense counsel chose to ignore.

Finally, the State's instruction No. 11 was tendered

without objection by the defendant at trial and cannot now be questioned unless it was "plain error," and I do not so regard it. See Supreme Court Rules 615(a), 451(c). 50 Ill.2d R. 615(a), 451(c).

I would accordingly affirm the judgment.

MR. JUSTICE RYAN, also dissenting:

I cannot concur in the reversal of this conviction based on the giving and the failure to give the instructions set forth in the opinion of the court.

As to defendant's instructions No. 6 and No. 7 which the trial court did not give, in reading the transcript of the conference on instructions I must conclude that defendant's counsel had withdrawn both of these instructions. After objections were made by the prosecutor to defendant's instruction No. 6, defense counsel said that he would "drop 6" and the court stated "he withdrew that." Then the court and the attorneys considered defendant's instruction No. 7 and objection was made to it. The prosecutor then suggested that defense counsel give "the instruction on that statute." Defense counsel said that he would "go for that" and that he would get one typed up. After further discussion the court inquired what defense counsel wanted to do with the instruction that they were considering and counsel said "mark it refused." It hardly seems appropriate now, many years later, for new counsel, in going through the record, to single out these two instructions as a basis for reversal. Both of these instructions had been withdrawn from the consideration of the court by counsel for the defendant.

As to the defendant's instruction No. 8 which the opinion of this court finds does not properly state the law, the same is an instruction tendered by and given at the request of the defendant. If it was error to give this instruction then it was error induced by the defendant and should not now be used as a reason for reversal. An accused cannot complain of defect in instructions which

were given at his request. *People v. Riley, 31 Ill.2d 490; People v. Beil, 322 Ill. 434; People v. Fox, 319 Ill. 606.*

The fourth instruction considered as defective by the opinion of this court is the State's instruction No. 11 which concerns the presumption of sanity. This instruction was criticized in *People v. Munroe, 15 Ill.2d 91.* In that case, however, there were other instructions which were held to be erroneous, all of which combined caused the court to reverse and remand. Also in that case the defendant had objected to the giving of the instruction on the presumption of sanity. In our case it appears that no objection was made by defense counsel to the giving of this instruction. Rule 25 of this court then in effect (7 Ill.2d 44) provided that in criminal cases instructions to the jury shall be settled and given in accordance with section 67 of the Civil Practice Act, but substantial defects are not waived by failure to make timely objections thereto if the interests of justice require. This court has held in many cases that one who fails to object to the giving of an instruction in a criminal case waives defects in the instructions which are not substantial. *People v. Lyons, 36 Ill.2d 336; People v. Cavaness, 21 Ill.2d 46; People v. Clements, 28 Ill.2d 534; People v. Minor, 20 Ill.2d 496; People v. Pizzo, 362 Ill. 194.*

The provisions of then Rule 25, now incorporated in Rule 451(c) (Ill.Rev.Stat. 1971, ch. 110A, par. 451(c)), places upon one who seeks in the reviewing court to avoid a waiver for failure to make specific objections to an instruction the burden of establishing: (a) that the defects in the instruction are substantial, and (b) that the giving of the instruction resulted in denying to the defendant justice and a fair trial. (See *People v. Price, 96 Ill.App.2d 86, 95; People v. Knox, 116 Ill.App.2d 427, 434.*) The mere giving of an instruction which has been criticized as "extremely likely to mislead" *(People v. Munroe)*, without objection, is not sufficient to warrant a reversal of a conviction in the absence of some showing by the defendant of prejudice

resulting therefrom. The opinion of the court does not find that State's instruction No. 11 was substantially defective or that the interests of justice require that the defects therein not be waived. Likewise, defendant does not now so contend. Defendant now only complains that this instruction does not correctly inform the jury as to the burden of proof on the question of insanity, contending that defendant's instruction No. 6 was necessary to supplement this instruction and properly instruct the jury on this question. This leads us back to the beginning of this dissent where it was demonstrated that the reason defendant's instruction No. 6 was not given was that defendant's counsel had withdrawn this instruction from the consideration of the court. It thus appears from the defendant's contention, not that the defendant was prejudiced by the giving of the unobjected-to State's instruction No. 11, but that the jury was not properly instructed on the question of burden of proof as to insanity because the defendant had withdrawn his instructions on that question.

For these reasons I cannot concur in the reversal of this conviction.