THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DONALD
WILLIAM LONO, Defendant-Appellant.

(No. 56329; ▮▮▮▮▮▮▮▮▮▮▮

First District (3rd Division)—April 5, 1973.

Gerald W. Getty, Public Defender, of Chicago, (James J. Doherty and John T. Moran, Jr., Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Elmer C. Kissane and James S. Veldman, Assistant State's Attorneys, of counsel,) for the People.

Mr. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court:

The trial court found Donald Lono guilty of the murder of Guy Thompson and sentenced him to the penitentiary for a term of 14 to 20 years. He contends that unrebutted evidence of insanity created a reasonable doubt of his guilt.

The events preceding Lono's indictment occurred around 8:30 P.M. on August 25, 1969. As Lono walked along a Chicago street, he approached Thompson who was drunk and lying in the doorway of a vacant building. Lono paused at the doorway and without words or apparent provocation, produced a gun, shot Thompson in the head, and walked away at a faster pace.

Carole Piets, a high school student, was the only witness to the shooting. She was standing in front of her house with her mother and the janitor of the building, William Martin, when Lono, previously unknown to her, came by waving a newspaper. Carole's dog, which was on a

leash, jumped at Lono. A conversation ensued between Lono and Martin which Carole did not hear. Lono then continued down the sidewalk and was soon followed by Carole and her dog. Half a block from her home, she saw Lono, who was about six feet in front of her, take a gun from his pocket and shoot Thompson. He said nothing to her as he hurried away. After looking at the victim, Carole returned to her mother and Martin and told them what she had seen.

Mrs. Piets corroborated her daughter's testimony as to what transpired when Lono approached them. She did not participate in the conversation between Lono and Martin but she observed that nothing appeared to be wrong; Lono talked in a low voice, was pleasant, and smiled. As the colloquy ended, she heard him say something about karate and tell Martin, "I see you take care of your wife." She did not hear the shot, but after talking to her daughter she went to the doorway, saw Thompson's body, and returned home and called the police. No other people were around. In about ten minutes, a squad car arrived and an ambulance came for Thompson. In the meantime, a crowd had gathered and she testified, as her daughter did, that Lono was in its midst. She did not tell the police of Lono's presence. Her explanation for not having done so was that she had been instructed not to say anything.

William Martin testified that Lono started waving his arms and kicking his feet after the dog lunged at him. The conversation began with Lono's mumbling something which wasn't clear to him. He guessed that Lono was talking about karate or judo because he thought that was what he had been demonstrating. During the conversation Martin understood Lono's words but had no idea what he was talking about. Although Lono's motions to the dog did not appear normal, he walked away in a straight manner. After the authorities removed Thompson, Martin saw Lono walking at a fast pace on the other side of the street; a group of children were chasing him and throwing things at him.

Shortly thereafter, police officers, responding to a radio message concerning a man with a gun, saw Lono enter a building with a revolver in his hand. They pursued him to the third floor and into an apartment. He ran through the apartment, opened a door and threw the revolver onto a balcony before they apprehended him. Although an odor of alcohol was on his breath an officer testified that, in his opinion, Lono was sober. The apartment, which was occupied by Lono and his mother, was not far away from where Thompson was killed.

Lono testified that he was 31 years old, single, a high school graduate and had spent 16 weeks at a school for computer operators. He was employed as an assembler of door adjusters and had been working for the

same employer for approximately two and a half years. He said that occasionally he had to be re-taught how to do his work. His parents were separated and he lived with his mother. In 1964 he was hit on the side of the head with a large beer bottle, suffered a concussion and was hospitalized for two weeks. Glass from the bottle cut his lip and a scar resulted. In 1956 he fell while he was hopping freight trains, hit his head on a steel girder and was taken to a hospital. He said he remembered nothing about the day of the shooting except that he talked to some police officers.

The defendant's brother-in-law testified that Lono acted normally most of the time; however, he was not rational on two occasions. In 1956 he suddenly started talking about becoming an astronaut. The conversation lasted ten or fifteen minutes but when he was questioned a few moments later about the possibility of entering the space program he did not know that the conversation had taken place. In 1967 he asked the witness, who was driving him home about 1:30 A.M., to drive him to his bank so that he could withdraw his money for the purpose of taking an extended international trip. Afterwards, he denied having money in the bank and when asked if he was serious about taking a trip said, "What trip?" The witness said that during the two conversations, Lono looked as if he were staring beyond him and talking to somebody else.

The defendant's sister observed him talking to himself on many occasions and, when she addressed him, he did not seem aware that he had been spoken to. She had written to her father about him and had contemplated taking him to a social worker because of the frequency of his self-conversations.

A second sister testified that her brother didn't make sense at times, was erratic in conversation and mumbled to himself. He was a placid person, slow to anger but easily frustrated and depressed. She had seen him intoxicated but did not think he drank excessively. At one time, during a phone conversation, he remarked that his sisters and mother had bad marriages and that he should have been more of a man and should have taken care of them. During the same discourse he wondered if he could fly out of the window; when reminded that he was on the third floor, remarked "with my luck I would probably break a leg."

His mother stated that her son worked the day of the homicide at his regular place of employment. Almost daily he would go to the mirrors in their apartment, look at his scar and feel it. She did not know the substance of his words when he talked to himself but when she confronted him he said everything was fine and not to worry about him. He

did not drink much but when he did he drank cheap wine and frequently locked himself in his room.

Before the trial Lono had been examined by psychiatrists and a competency hearing had been held. The psychiatrists reported that he had a sociopathic personality disturbance, knew the nature of the charge and was able to cooperate with counsel. He was found to be competent. Lono did not give notice that he would rely on the defense of insanity at his trial, the evidence, insofar as it was known to the State, did not indicate that such a defense would be raised and the State did not request that he submit to a psychiatric examination. (Ill. Rev. Stat. 1969, ch. 38, par. 115—6.) At his trial, the defendant presented neither expert nor medical testimony as to his mental condition at the time of the homicide and none of his lay witnesses was asked to express an opinion as to his sanity. Thus, there was a total absence of medical conclusions or lay opinions either couched in the terms of the statutory definition of insanity or in language even approximating that definition.

The trial judge, after reviewing the law and analyzing the evidence at the end of the trial, said that he did not believe there had been a real attempt to raise the issue of insanity and that the presumption of sanity had not been overcome. He said there was no real evidence that the defendant had any mental disorder—there was just evidence of bizarre behavior.

In arguing that the judge was mistaken, the defendant asserts that the evidence was sufficient to raise a reasonable doubt of his sanity; that the State presented no contrary evidence and thus did not prove him sane beyond a reasonable doubt. The defendant points to his behavior prior to the day of the crime and to his conduct on that day: his head injuries, talking to himself, periods of depression and frustration, memory loss, irrational ideas about flying out a window and grandiose schemes of becoming an astronaut and a world traveller; his kicking his feet and waving his arms, his incoherent mumblings, his killing a man without motive or reason, his returning to the scene of the offense and being chased by children, his not remembering firing the gun, working, or the other things he did on the day of the crime.

The Criminal Code defines insanity as follows:

"(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

(b) The terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct." Ill. Rev. Stat. 1969, ch. 38, par. 6—2.

■■ The law presumes all men to be sane. (*People v. Groves* (1968), 100 Ill.App.2d 171, 241 N.E.2d 622.) The affirmative defense of insanity at the time of a crime must be raised at the trial; once evidence of insanity is introduced by either the State or the defendant, the presumption ceases and it becomes the State's burden to prove beyond a reasonable doubt that at the time of committing the crime the defendant was legally sane. Ill. Rev. Stat. 1969, ch. 38, par. 3—2(a), (b); *People v. LeMay* (1966), 35 Ill.2d 208, 220 N.E.2d 184.

■■ The issue of insanity is usually raised, at least in part, by the expert testimony of psychiatrists, by the testimony of physicians based upon their observations, or by the opinions of laymen who have had the opportunity to observe the accused and whose opinions are based on what they have seen. However, neither psychiatric testimony nor medical or lay opinion is essential if the evidence itself portrays serious mental defects or reveals a substantial history of mental illness. See *e.g., People v. Childs* (1972), 51 Ill.2d 247, 281 N.E.2d 631; *People v. Haun* (1966), 71 Ill.App.2d 262, 217 N.E.2d 470.

■■ Although we might disagree with the trial court's opinion that the defendant's evidence did not overcome the presumption of sanity, we cannot disagree with its finding that the defendant was sane at the time of the crime. The defendant's evidence brought his criminal responsibility into question and it became the State's burden to prove that he was sane when he killed Thompson. To meet this burden it was not necessary for the State to produce additional evidence or to offer expert testimony; it could, if it chose to do so, rely upon the facts already in evidence and the inferences to be drawn from these facts. First, the State had little, if any, opportunity to gather rebuttal evidence. There had been no advance warning by either formal notice or opening statement that the affirmative defense of insanity would be raised. The State's own evidence showed odd behavior on the defendant's part immediately before the offense, perhaps intoxication, but no serious mental defect which would indicate his substantial incapacity to appreciate the criminality of his subsequent conduct. Second, the defense testimony was of dubious quality. It seemed to have been offered more in the way of mitigation of sentence than in aggressive defense. No witness, expert, medical or lay, expressed an opinion as to Lono's mental condition at the time of the crime. There was no evidence of prior psychiatric treatment or confinement in a mental institution. Members of his family only detailed his peculiar traits and unusual behavioral characteristics, some

of which had occurred years before the offense. His own testimony that he did not remember shooting Thompson placed his credibility in issue. ■■■ Although the State offered no rebuttal evidence, under the facts of this case, none was required. When the presumption of sanity has been overcome the question of a defendant's sanity or insanity is to be determined from the whole evidence, without reference to the presumption. (*People v. Saylor* (1925), 319 Ill. 205, 149 N.E. 767.) It was for the trial judge, sitting without a jury, to determine Lono's sanity. The whole evidence justified the court's conclusion that he was sane. The evidence presented in his behalf fell far short of establishing a mental disease or mental defect within the statutory definition of insanity. Evidence more indicative of mental aberration than that presented here has been held insufficient to establish insanity. Evidence that a defendant has been disturbed in mind and excited do not justify a reasonable doubt of sanity. (*Montag v. People* (1892), 141 Ill. 75, 30 N.E. 337). Evidence of idiosyncratic behavior and irresponsibility of conduct are insufficient to raise the issue. (*People v. McBride* (1970), 130 Ill.App.2d 201, 264 N.E.2d 446.) Evidence of personality disorders does not constitute a mental defect within the meaning of the statute (*People v. Williams* (1967), 38 Ill.2d 115, 230 N.E.2d 224) and neither does testimony that a defendant forms unrealistic judgments and is unable to evaluate situations that confront him. (*People v. Miller* (1965), 33 Ill.2d 439, 211 N.E.2d 708.) Depravity of character, abandoned habits, or the commission of atrocious crimes are not in themselves evidence of insanity. (*People v. Robinson* (1961), 22 Ill.2d 162, 174 N.E.2d 820). Blackouts or amnesia may or may not be a sign of insanity. *People v. Bacon* (1920), 293 Ill.210, 127 N.E. 386; *People v. Conrad* (1967), 81 Ill.App.2d 34, 225 N.E.2d 713.

■■ There was no testimony which related Lono's alleged lapse of memory to insanity, and his mere statement that he could not recollect the events of the day cannot be taken to raise a reasonable doubt of his sanity. The trial court heard his testimony and was under no obligation to believe him. As the trier of the facts the court was the judge of the credibility of the witnesses and it could have believed that Lono was conscious of what took place.

Among the facts and the reasonable inferences the court could have considered in determining that Lono knew what he was doing were these: When Lono shot Thompson he was unaware that he was being observed. He scurried away as soon as the shot was fired. Not knowing that he had been seen, he returned to the scene of the crime. He mingled in the crowd, finding security in its numbers. When the crowd dispersed he again scampered away. For some reason, unexplained in the record,

children tried to impede his escape. A short time later, when police approached him, he ran into a building and up the stairs to his home on the third floor. He ran, although he had not been accused, because he was conscious of guilt. Before the police could reach him, he attempted to rid himself of incriminating evidence by discarding the gun he was carrying. There was no testimony that he was incoherent, disoriented or out of touch with reality after his arrest and there was no testimony by his mother, employer, fellow-employees or anyone else that he was in this condition the day of his arrest.

Under the evidence and inferences from the evidence the court could properly conclude that the defendant at the time of the crime was sane beyond a reasonable doubt.

The judgment is affirmed.

Affirmed.

McNAMARA and McGLOON, JJ., concur.