**People of the State of Illinois, Plaintiff-Appellee, v. Walter Groves, Defendant-Appellant.**

**Gen. No. 51,987.**

First District, Third Division.

October 10, 1968.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Saul Brauner and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Robert B. Rosen, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court.

The defendant, Walter Groves, was indicted for murder. A jury found him guilty and he received a 15 to 25 year sentence in the penitentiary.

On March 29, 1966, at 7:30 a. m., Jessie Everett and her sister, Mildred Bryant, were waiting for a bus on the corner of 31st Street and Indiana Avenue, Chicago. Mrs. Bryant saw Groves, whom they both knew, across the street. He started toward them and pulled a gun from under his jacket. She warned her sister and they both ran. A shot was fired as Groves followed them through a small park. At the end of the park Mrs. Everett tripped and fell. Groves kneeled over her and shot her in the head.

Mrs. Bryant was 12 feet away. Groves chased her, pointed his gun at her and threatened to kill her. By this time a crowd had gathered and a police officer arrived on the scene. He saw Mrs. Everett's body and the defendant standing nearby with a gun in his hand. As the officer approached, the defendant handed him his gun and said, "Yes, I shot her."

The sole issue on appeal is Groves' sanity. He makes no contention as to his competency to stand trial but argues that there was a reasonable doubt of his sanity at the time of the crime.

The evidence disclosed that Groves met Mrs. Everett in July of 1965 at their place of employment. She asked him to take a room at her home which he did, paying $25 the first week, then living like one of the family, sharing expenses and duties thereafter. On March 17, 1966, they had a quarrel over $1,800 which Groves claimed was missing from a drawer. Groves testified that when asked about it, Mrs. Everett said she had the money and would return it. Upset, Groves left the house.

He returned on the 19th of March. He testified that a tenant who was present told him to leave so he rushed out. According to Mrs. Everett's daughter, Groves threatened her and her mother with a meat cleaver. Her mother ran from the house and the tenant took the weapon from Groves. That night he was arrested and released on bail. After the 19th, Groves said he walked the streets, drank coffee and catnapped in all-night cafes. He called Mrs. Everett on the phone and asked if he could come back but she said no. He also asked for his clothes and money. In one conversation a man told him that he had his money and to quit pestering Mrs. Everett.

On the morning of March 29th Groves said he was standing outside a cafe when he saw Mrs. Everett get off the bus. "Everything turned white and red," and he could not remember what he did. His next memory was

of waking up in jail and hearing an officer tell him to hand over his belt and shoestrings.

At the trial there was testimony relevant to sanity from lay witnesses, the defendant and two psychiatrists. Mrs. Everett's daughter testified that she saw Groves between 50 and 100 times from November 1965 until March 1966. His behavior on these occasions was normal and, with the exception of March 19th, there was nothing unusual when he became angry. The police officer who arrested the defendant testified that he was cooperative. Another officer testified that on the morning of the 29th he interrogated the defendant at the police station, that his answers to questions were responsive and there was nothing unusual about his appearance.

Groves testified that he was 55 years of age, that he could not read or write but could sign his name. He said that he was born in Mississippi. He never met his parents but lived with his sister until the age of seven when he was given to a white farmer as a laborer. He worked in the fields by day and made whiskey at night. At the age of 13 he ran away. About this time he was hit on the head and had suffered headaches ever since. After leaving the farm he hoboed until the age of 18 when he obtained a job in a laundry in Louisiana. His employer taught him the trade and took him into his home, treating him as his own son. Two years later the employer died and left him $5,000. Subsequently, he was taken in by another Louisiana family. He told the housewife about his money and one day when he returned home, the money and the woman were gone.

He resumed his hoboing and in 1949 came to Chicago and worked for three years. Then he held up a tavern, was arrested and convicted, and spent nearly seven years in prison. After his release he went to California where he was accused of attempting suicide by hanging. He denied trying to kill himself but reported that his wife,

stepdaughter and a doctor said that he did. He returned to Chicago in July 1965.

Groves was examined by two psychiatrists. Dr. David Rothstein, a psychiatrist in private practice, examined him at the County Jail on June 23, 1966, for one and one-half hours. Dr. William Haines, Director of the Behavior Clinic of the Criminal Court of Cook County, examined him on June 21, 1966, for approximately 45 minutes.

Dr. Rothstein testified that the defendant cooperated and responded truthfully. He determined that the defendant had an immature, inadequate personality—inadequate to handle the responsibilities and stresses of ordinary life. He considered this a mental defect which resulted from a lack of normal home life and from some inherent defect in his biological makeup. According to the doctor, these conditions were quite severe and, because of the defect, he lacked substantial capacity to conform his conduct to the requirements of the law.

Dr. Haines also found the defendant cooperative and responsive. He said that he was illiterate and diagnosed his condition as that of a sociopathic personality. He concluded that the defendant could conform his conduct to the law and that he appreciated the criminality of his behavior.

The Criminal Code defines insanity as follows:

> "(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

> "(b) The terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct." Ill Rev Stats 1965, c 38, § 6–2.

175

■ The law presumes all men to be sane. People v. Robinson, 22 Ill2d 162, 174 NE2d 820 (1961); People v. Conrad, 81 Ill App2d 34, 225 NE2d 713 (1967). The defense of insanity at the time of a crime must be raised at the trial; once evidence of insanity is introduced, the presumption of sanity does not prevail and the burden falls on the State to prove beyond a reasonable doubt that at the time of committing the crime the accused was legally sane. People v. Le May, 35 Ill2d 208, 220 NE2d 184 (1966).

■■ The issue of sanity is a question of fact for the jury. People v. Ford, 39 Ill2d 318, 235 NE2d 576 (1968); People v. Allen, 37 Ill2d 167, 226 NE2d 1 (1967). A reviewing court will not disturb the finding of the jury unless it is so palpably against the weight of the evidence as to indicate that the verdict was based on passion or prejudice or otherwise leave a reasonable doubt of the defendant's responsibility. People v. Thomas, 409 Ill 473, 100 NE2d 588 (1951).

■ The expert and lay testimony presented by the State, and the facts of the case itself, sustain the jury's conclusion that Groves appreciated the criminality of his conduct and was able to conform his conduct to the requirements of the law. The evidence proved that the killing of Mrs. Everett was deliberate. Groves lived at her home and worked where she did; he knew the time she went to work and where she transferred buses to go to her place of employment on west 31st Street. Armed with a gun, he waited at the intersection for her to arrive. When she did, he pursued her, fired one shot and then, as she stumbled, knelt beside her and fired another into her head. He paid no attention to Mrs. Bryant until he had killed Mrs. Everett; he then turned upon her saying: "Now I'm fixing to kill you." The singling out of Mrs. Everett, the statement to Mrs. Bryant, the yielding of his gun upon the arrival of the police and the immediate statement to the officer that he had shot Mrs.

Everett showed that he knew the nature and gravity of his act.

The sanity of the defendant was proved beyond a reasonable doubt and the judgment of conviction will be affirmed.

Affirmed.

SCHWARTZ and SULLIVAN, JJ., concur.