The People of the State of Illinois, Plaintiff-Appellee, *v.* Philip B. Moore, Defendant-Appellant.

(No. 73-168; ▮▮▮▮▮▮▮▮

Third District—May 7, 1974.

Franklin S. Wallace, of Rock Island, for appellant.

L. E. Ellison, State's Attorney, of Morrison, for the People.

Mr. PRESIDING JUSTICE SCOTT delivered the opinion of the court:

The defendant was found guilty of attempted murder and attempted burglary by a jury and sentenced to a term of 8 to 20 years on the former charge and 5 to 20 years on the latter charge. This is the second time the case has been before this court. See *People v. Moore*, 6 Ill.App.3d 568, 286 N.E.2d 6.

Defendant was initially tried and sentenced to 10 to 20 years for attempted murder and aggravated battery, and 5 to 30 years for burglary. In both trials the defense was insanity.

At the time this court first considered this case it was of the opinion that certain evidence produced after trial and contained in the probation report and investigation sufficiently impeached the testimony of State witness Dr. Rydak so as to warrant the granting of a new trial.

On March 3, 1969, in the late afternoon defendant met a friend, Kenneth Finkle, in Sterling, Illinois. The defendant was armed with a .22 Colt automatic revolver. The two visited a few places in Sterling and according to Finkle's testimony they were looking for someone to kill. At one point defendant suggested they kill a young lady known to Finkle, but Finkle prevented this by expressing his disapproval. Finkle was apparently unarmed. About 9 P.M. they saw a woman walking toward her car parked in the Y.M.C.A. parking lot. She had been shopping in Sterling. Neither the defendant nor Finkle knew her. Defendant said to Finkle, "Let's go get her" and the defendant ran toward the woman who was by then entering her automobile. Finkle did not follow. He observed defendant trying to push his way into the car and testified the woman started to scream. Defendant then said, "Lady, you're dead" and continued to push his way into the car. He then fired two shots at the lady.

The victim testified that when defendant approached the car he kept pushing and trying to get her to slide over in the car. She commenced screaming and he put his hand over her mouth, then told her she was dead.

At the first trial defendant testified that as he neared the car he pulled out the gun and pulled the hammer back. The victim heard the noise and turned and started to scream. He then pushed her down on the front seat of the car. He further testified, "She was more or less laying on her back and I half straddled her, put my left hand on her mouth to stop her from screaming and attempted to fire a shot from the gun which was aimed at her forehead." He then testified that he fired a round but the gun wouldn't fire and he "reached up with my left hand and pulled the mechanism on the automatic so it would eject the bad shell and reload it." According to this own testimony he then re-aimed the gun at the

victim's forehead and fired twice. He stated that he could not remember if he told Finkle, "Let's go get her" when he spotted the victim but denies that he intended to rob, rape or kidnap her but he intended only to hurt her. He further testified he stopped shooting because the gun jammed and while he was in the process of unjamming the same he "suddenly realized what was going on" and that he yielded to the victim's pushing. He testified that the victim did fall to the pavement and that he did kick her while she was lying on the pavement. He further testified that he did not know if he tried to shoot her again.

Finkle testified that shortly after the two shots were fired he ran to the passenger's side of the car to warn defendant the police car was coming. He testified that defendant did not appear aware of the approaching squad car. He further testified that he proceeded to walk out of the parking lot when the defendant ran past him.

At the initial trial defendant testified he ran from the scene with the gun in his hand; that he ran toward an alley, down the alley and at the end of the block saw a young boy in a car talking to a girl in another car; he asked them for a ride and then offered them $10. The boy refused and the defendant walked and ran 20 blocks to his home. His home was only 10 blocks away but he did this to avoid being caught. En route he hid the gun in a tree and later advised the police where it was hidden.

On cross-examination defendant testified he told the victim she was dead "meaning that I was going to harm her" and "I pulled the trigger on the gun and nothing happened like it was dead and I ejected the shell manually, let the slide go back, fired a shot at this time. I fired the shot, Mrs. Mattox I remember swung around in such a manner to throw the gun off to the side. I think it hit the floor of the car. This was on the passenger side and I re-aimed the gun at Mrs. Mattox's forehead and pulled the trigger again. At this time I pulled the trigger Mrs. Mattox turned her head to the side and the bullet then struck in the side of her head. I thought in front, I thought I saw blood coming from the front." He further testified that she was screaming and asking him not to do this.

At the second trial, the one involved in this appeal, the defendant testified that he had no memory as to what occurred on March 3, 1969, nor did he have any recollection of the events of the first trial. He did not deny any part of his testimony at the first trial but merely testified that he could not remember what occurred and in fact could not remember testifying at that trial.

Appellant first contends that the State failed to prove defendant's sanity beyond a reasonable doubt, contending that defendant had pre-

sented evidence which raised a doubt as to defendant's sanity at the time of the commission of the crime.

■■ The law presumes all men to be sane. (*People v. Lono,* 11 Ill.App. 3d 443, 297 N.E.2d 349; *People v. Groves,* 100 Ill.App.2d 171, 241 N.E.2d 622.) Once evidence of insanity is introduced by either the State or the defendant presumption ceases and it becomes the State's burden to prove beyond a reasonable doubt that at the time of committing the crime the defendant was legally sane. Ill. Rev. Stat., ch. 38, par. 3—2 (a), (b); *People v. Le May,* 35 Ill.2d 208, 220 N.E.2d 184.

The defendant called Dr. Daniel Schiff. a physician specializing in psychiatry, to testify. He testified that he had seen defendant on a number of occasions and at the first such interview on August 6, 1969, he obtained defendant's history and testified that defendant related to him the events that occurred on the date of the crime. He testified as to the substance of the conversation with the defendant and concluded that defendant at the time of the commission of the crime suffered from a mental illness called paranoid schizophrenia. He further testified that defendant at the time the crime was committed was unable to control his impulses and to conform to law, even though he knew that he was doing a wrong act. He testified that he again saw the defendant on November 30, 1972, at which time he noted an improvement in defendant's condition from the last time he had seen him in 1969. On cross-examination Dr. Schiff described paranoid type schizophrenia and acknowledged that his opinion was based in part on the assumption that defendant was telling the truth. He further testified that the distinction between a schizoid personality and a schizoid paranoid is that the former is shy and retiring, withdrawn and does little else. The other is "over the line and is quite psychotic or crazy." He further stated that it is possible for a person to be unable to conform his conduct to the requirements of the law and not be suffering from a mental disease and stated that these persons are called criminals. He acknowledged that the fact that the person might have an irresistible impulse to do something doesn't necessarily mean he is mentally ill or has a mental disease. Dr. Schiff concluded that in his opinion defendant was 100 percent incapable of conforming his conduct to the law at the time of the commission of the crime.

Dr. W. S. Rydak was called by the State and testified as to interviews he had with the defendant. He like Dr. Schiff is a physician specializing in psychiatry. The first interview was held on September 3, 1969. He obtained the history of defendant and testified that the defendant had related to him the incidents that occurred on the day of the crime. He

testified that in his opinion the defendant was not suffering from a mental illness or disease at the time of the commission of the crime. He did testify that the defendant was unable to appreciate the criminality of his conduct at the time he committed the crime because of stress imposed upon him. He stated that defendant was not suffering from schizophrenia; that on examination the defendant's mental grasp was good; that there was no evidence of a mental deficiency and that while the defendant lacked capacity to conform his conduct to the requirements of law at the time the act was committed this was not a mental illness but an emotional stress.

The facts in the case illustrate that defendant left his home on the evening in question carrying a loaded revolver. According to the witness Finkle defendant advised him that he was looking for someone to kill and that he had first discussed the possibility of killing another girl, only to be restrained by Finkle. The testimony further illustrates that defendant had a clear recollection of the events leading up to the crime, the commission of the crime, and events subsequent to the same. His testimony of where he and Finkle had been, the beverages they consumed, what they had done and how long they had stayed at the various locations in Sterling, indicates total awareness of the events leading up to the crime. The description of the events that occurred at the time of the shooting are in great detail, as is his description of the flight from the scene of the crime, including his hiding of the gun and the fact that he disclosed the location of the gun to the police officer.

The shooting itself was premeditated and only the selection of the victim can be described as being on impulse.

As stated in *People v. Lono, supra,* when a presumption of sanity has been overcome the question of defendant's sanity or insanity is to be determined by the whole evidence without reference to the presumption. *People v. Saylor,* 319 Ill. 205, 149 N.E. 767.

In *People v. Lono, supra,* the facts are similar in nature to the case at bar and equally bizarre. In that case the defendant Lono shot and killed a drunk who was lying in the doorway of a vacant building for no explainable reason, without words or without provocation. There, too, the defendant testified he remembered nothing about the day of the shooting. The court there stated:

> "The trial court heard his testimony and was under no obligation to believe him. As the trier of the facts the court was the judge of the credibility of the witnesses and it could have believed that Lono was conscious of what took place." (11 Ill.App.3d at 449.)

The same applies to the jury in the case at bar. They were the trier of facts and at the hearing of this case were at liberty to believe or dis-

believe the defendant's testimony when he denied any present memory of the events that took place on the day of the crime. It was for the jury to decide from the totality of all evidence whether the defendant was sane or insane at the time of the commission of the crime. His flight from the scene after the crime had been committed and his evasive action attempting to buy a ride to his home some 10 blocks away and walking 20 blocks to get there to avoid the police, and his subsequent concealment of the gun all indicate an awareness on his part of the criminal nature of the act and the jury was entitled to consider this along with the testimony of the two psychiatrists in arriving at their decision. The defendant's testimony clearly illustrates a total awareness of the events leading up to and during the commission of the crime. As stated in *People v. Burress,* 1 Ill.App.3d 17, 272 N.E.2d 390, it is for the trier of facts to determine from all the evidence whether the prosecution has satisfied the burden of proving the defendant's sanity.

Appellant contends that Dr. Rydak's testimony did not rebut the testimony of Dr. Schiff and that Rydak's testimony has been impeached as a matter of law. His basis for this contention arises out of our previous decision in his case. (*People v. Moore,* 6 Ill.App.3d 568, 286 N.E.2d 6.) There we noted that the probation investigation report contained a written report of Dr. Rydak which stated the following:

> "The diagnosis, as a result of observation of the patient during the interview, the longitudinal history as given by the patient (no other information was available to the examiner at this time) and observation of his responses, his attitude, his affect and his trend of thought, is: * * * Personality Disorder, Paranoid-Schizoid Behavior Pattern." (6 Ill.App.3d at 570.)

That report further stated:

> "At the time he committed the offense on March 3, 1969, he was unable to appreciate the criminality of his conduct because of stresses which were imposed upon him: * * *
>
> At the time he committed the offense on March 3, 1969, he lacked the capacity to conform his conduct to the requirements of the law." 6 Ill.App.3d at 570.

■■ It must be noted in the case at bar that Dr. Rydak's testimony was consistent with that stated in the report, with the explanation as to the meaning of these particular paragraphs. While the probation report was not referred to directly in his testimony either on direct or cross examination, Rydak did testify that the stresses imposed upon the defendant were not brought about by some mental disease or mental illness but by reason of a personality disorder. Dr. Rydak testified that at the time defendant committed the acts he was unable to appreciate the criminal-

ity of his conduct and lacked the capacity to conform his conduct to the requirements of law because of stress which was imposed upon him. As stated in *People v. Lono, supra:*

> "Evidence that a defendant has been disturbed in mind and excited do not justify a reasonable doubt of sanity. (*Montag v. People* (1892), 141 Ill. 75, 30 N.E. 337.) Evidence of idiosyncratic behavior and irresponsibility of conduct are insufficient to raise the issue. (*People v. McBride* (1970), 130 Ill.App.2d 201, 264 N.E.2d 446.) Evidence of personality disorders does not constitute a mental defect within the meaning of the statute (*People v. Williams* (1967), 38 Ill.2d 115, 230 N.E.2d 224) * * *."

■■ The statute provides that a person is not criminally responsible for conduct if at the time of the act he has a "mental disease or mental defect." Dr. Rydak's testimony tends to establish defendant was not afflicted by either. (Ill. Rev. Stat., ch. 38, sec. 6—2.) We feel there was more than sufficient evidence on this point to permit a jury to consider the question and we further feel the jury was correct in its conclusion.

Defendant next contends that the court failed to instruct the jury of the term "murder." The court gave the following instructions:

> "A person commits the crime of attempt who, with the intent to commit the crime of murder, does any act which constitutes a substantial step toward the commission of the crime of murder. The crime attempted need not have been committed."

The court also gave the following instruction:

> "To sustain the charge of attempt the State must prove the following proposition:
>
> First, that the defendant performed an act which constituted a substantial step toward the commission of the crime of murder; and
>
> Second, that the defendant did so with the intent to commit the crime of murder; and
>
> Third, that the defendant was then sane.
>
> If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty.
>
> If you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty."

Both instructions are from I.P.I. and defendant's only contention is that the court's failure to instruct the jury of the term of "murder" permitted the jury to guess, speculate and conjecture what the term "mur-

der" really is—contending that when the charge is attempt the court must define the crime attempted.

This contention was answered by the supreme court in *People v. Gersbacher*, 44 Ill.2d 321, 255 N.E.2d 429. In that case an instruction similar in nature was given. The supreme court said:

> "Although it would have been preferable to instruct the jury on the elements of the crime attempted, after reviewing the record before us we find that the evidence presented to the jury regarding the attempted murder was such that no error was occasioned by the failure of the court to give an instruction in this regard." (44 Ill.2d at 325-326.)

The same can be said in this case.

■■ No error was committed by the lower court in its failure to give the murder instruction as requested here by defendant.

Defendant next contends that the trial court committed error in allowing the prior testimony of the defendant to be read to the jury in the State's case in chief, citing the dissenting opinion in *Miller v. People*, 216 Ill. 309, 74 N.E. 743. In that case as here the defendant's testimony given at a prior trial of the cause was read to the jury by the court reporter, but not in total. The State was allowed to elicit just those questions and answers from the reporter that the State felt appropriate. The supreme court ruled this to be error but stated that his prior testimony was admissible. "The statements or admissions made by him when so testifying were in nowise privileged, but might lawfully be proven upon another trial for consideration in determining his guilt or innocence." The dissent, three judges dissenting, held that permitting his prior testimony to be introduced at the trial was a violation of the defendant's right to remain silent.

In *People v. Luna*, 37 Ill.2d 299, 226 N.E.2d 586, defendant's testimony given at a hearing on his motion to suppress a confession was used to impeach him at the trial of the case. The supreme court ruled this to be error and said:

> "In order to avail himself of his constitutional rights under our procedure, defendant was compelled to move to suppress the confession. It also appears from the record that his testimony was essential on this motion. Defendant was therefore placed in the dilemma of either foregoing his constitutional right to a suppression of an unlawful confession, or of running the risk of his testimony being used against him at the trial. We think it is no answer to say that defendant need not have taken the stand at his trial. One ought not be forced to choose between availing himself

of two equally valuable rights. \* \* \* This is unlike the situation in *Miller v. People*, 216 Ill. 309, 74 N.E. 743, where the defendant voluntarily availed himself of his right to testify at his first trial and the admissions were used against him at his second trial for the same offense. It was unnecessary for him to testify at his first trial in order to preserve to him all of his constitutional guaranties." 37 Ill.2d at 308.

■ In *Harrison v. U.S.*, 392 U.S. 219, 20 L.Ed.2d 1047, 88 S.Ct. 2008, the United States Supreme Court said:

"In this case we need not and do not question the general evidentiary rule that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings. A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and that waiver is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him." 392 U.S. at 222.

The record clearly establishes that the defendant waived his right to remain silent in giving testimony at the first hearing of this cause.

Defendant's final contention is that the sentence imposed upon him was excessive. He was sentenced to serve a term of 5 to 20 years for burglary and 8 to 20 years for attempted murder.

As we stated in *People v. Short*, 4 Ill.App.3d 832, 281 N.E.2d 783:

"We have frequently recognized that the propriety of imposing a sentence is normally an issue on which the trial court is given wide latitude. (*People v. Leggett, supra; People v. Hanserd*, 125 Ill.App.2d 465, 261 N.E.2d 317.) While by rule the Supreme Court has vested this court with the power to modify sentences (Ill. Rev. Stat., ch. 110A, par. 615(b),) we have nevertheless always indicated that this power should be exercised with caution. Normally the trial court is in the best position to determine the circumstances, to weigh credibility, and to evaluate the record made at the hearing in aggravation and mitigation."

■■ The sentence imposed upon the defendant falls within the limitations prescribed by the applicable statute. The facts of the case justify the imposition of the penalty handed down by the lower court and the lower court was much better positioned than we are in making the determination of the time to be served. There is nothing in this record and certainly nothing in the abstract of the record that would indicate to this court grounds to question the judgment of the lower court and modify the sentences.

For the reasons stated herein the judgment of the lower court is affirmed.

Affirmed.

ALLOY and STOUDER, JJ., concur.