THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
SIDNEY FOSTER, Defendant-Appellant.

First District (4th Division)    No. 63179

Opinion filed December 22, 1977.

LINN, J., dissenting.

McCoy, Ming & Black, of Chicago (Ellis E. Reid, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Iris E. Sholder, and Edward D. Stern, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JOHNSON delivered the opinion of the court:

The defendant, Sidney Foster, was charged by indictment for the murder of Vivian Patterson in violation of section 9—1(a)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1971, ch. 38, par. 9—1(a)(2)), and charged with concealment of the victim's homicidal death in violation of section 9—3.1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1971, ch. 38, par. 9—3.1). Following a jury trial, the defendant was found guilty of both offenses and was sentenced to concurrent terms of imprisonment of 125 to 250 years and 2 to 6 years. The defendant's motion for a judgment of acquittal notwithstanding the verdict or, in the alternative, motion for a new trial, and his motion to arrest judgment were denied. This appeal followed.

The issues presented for review are (1) whether the trial court erred in denying defendant's motion for a judgment of acquittal based on the failure of the prosecution to prove beyond a reasonable doubt that the defendant caused the death of the decedent, Vivian Patterson; (2) whether the trial court erred in denying defendant's motion for a judgment of acquittal based on the failure of the prosecution to prove beyond a reasonable doubt that the defendant was sane at the time he committed the acts which constitute the offense of concealment of a homicidal death; (3) whether the trial court erred in denying defendant's motion for a new trial where the court (a) admitted irrelevant evidence which was prejudicial and inflammatory, (b) refused the defendant's offers of proof, and (c) denied defendant's motion to suppress evidence obtained in violation of the defendant's constitutional rights, and (d) where the prosecutor suppressed evidence favorable to the defendant which denied the defendant due process of law, and (4) whether the trial court erred in refusing to charge the jury as requested by defendant.

A few days prior to the commencement of the trial, one of the attorneys for the defendant moved the court to appoint experts to examine the

defendant to determine his mental competency pursuant to section 5—2—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1005—2—1). In the motion, the attorney stated that he had reasonable cause to believe that defendant was presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly assist in his own defense and, also, that defendant was insane at the time of the alleged offense of concealment of a homicidal death. According to the record, a hearing was held on the motion on August 11, 1975, evidence was heard, and the motion was denied. There is no transcript of this hearing in the record.

The following pertinent facts were adduced at trial: By January 1974, the defendant had been living with the victim, Vivian Patterson, and her four children, Solomon and Sandra Hudson and Sherri and Ronald Patterson, about 2½ years at her apartment, located at 2030 South State Street, Chicago, Illinois. Foster owned Crown Town Records, a small recording company in Chicago, and managed various young musical groups. Vivian Patterson sang in small night clubs on Chicago's south side. The relationship between the defendant and Ms. Patterson was platonic. Foster was trans-sexual; although he was biologically, physiologically, and anatomically a male, he felt that psychologically he was a female. However, he claimed to be the father of Solomon Hudson who was 12 years old in 1974.

Solomon testified that the defendant insisted he be called Mama, claiming he was Solomon's mother. Without objection, he further testified that Foster forced him to engage in abnormal sexual conduct and to observe defendant engage in sexual acts. Solomon explained that he never told his mother of this abuse.

On January 23, 1974, the dismembered and badly decomposed body of Vivian Patterson was discovered by the Chicago Police after responding to a call regarding a suspicious car parked in a lot at 2030 South State Street. The police noticed a strange odor emanating from the trunk of the car; the trunk was opened and a torso, arms, and legs were discovered wrapped in bed sheets. The only identifying marks on the car were a "Cee Fred" sticker and the auto identification number. The police learned through "Cee Fred" that the auto belonged to the defendant. The corpse was transported to the County Morgue in a squadrol which was not examined for spent bullets after the body was removed.

During the Christmas holiday, 1973, Vivian's four children visited Lucius Hudson, her ex-husband. Sandra, Ronald, and Sherri left on Christmas Day and Solomon joined them 2 days later. Sandra returned home on December 27, 1973, to pick up some clothes. She testified that this was the last time she saw her mother. She again returned to the apartment on December 29, 1973, and Foster told her that Vivian was in

California buying a home. Foster cautioned her not to tell anyone about these matters.

On January 23, 1974, Sandra was ill and stayed home from school. Throughout the day, Foster kept looking out her bedroom window down at the parking lot where his car was parked. Foster asked her to accompany him across the street for the purpose of making a telephone call. After placing the call, Foster said they would have to pick the other children up from school. Sandra testified Foster then said that "[she] was going to hate him for the rest of [her] life." They picked up Ronnie and Sherri, and met Solomon on his way home from school. At this time, according to Sandra, Foster stated "he had to get two plane tickets in false names" for himself and Solomon. He placed Sandra, Ronnie, and Sherri in a cab and took Solomon with him to the home of his parents. Detective cars were parked in front, so they exited through the rear and were driven to defendant's sister's home. On January 24, 1974, Foster called the police and voluntarily turned himself in.

In addition to testifying about his relationship with Foster, Solomon testified that he spoke to his mother the day after arriving at Lucius Hudson's home. He again called his mother on December 29, 1973. Foster answered the phone and said Vivian was in California, but he should tell no one this, especially Mr. Hudson. When he returned home on the 31st, Foster told him that Vivian had been in a plane crash in California and was in critical condition. Thereafter, in January 1974, the defendant told Solomon that Vivian was killed by some men who put "her in the trunk of [his] car and it looks like [he] did it." He first said the killers were members of the "syndicate." Then he said "Jiggy" killed her, and finally that "Jimmy Wayne" killed her.

Both Sandra and Solomon noticed a "bad smell" coming from their mother's bedroom when they returned to the apartment. Foster explained that some turkey and chicken bones were left in the room. He refused the children admittance to the room, claiming Vivian had the key in California.

Sometime in January 1974, Diane Adams, a friend, inquired about Vivian. Foster told her Vivian had been injured in a plane crash in California. Diane called her mother in California who heard of no plane crash. Lucille Wood, a neighbor, asked if Vivian was at home on January 20, 1974, and Foster responded that she was on the West Coast. That same night, she received a call for Foster. Foster was summoned, briefly conversed, and after hanging up, told Mrs. Wood that Vivian had been in an accident.

Officers Bobko and Savage interviewed the defendant on January 24, 1974. They told the defendant that he was a suspect in a homicide

investigation. Officer Savage read the defendant his constitutional rights. He was asked if he knew anything about Vivian Patterson's death. He replied that he was not sure. Foster asked if the police had been to Vivian's apartment. Savage replied that they had been there. Foster stated he was afraid for the life of himself and his children and that he could relate the circumstances of Vivian's death, but would not name the offenders as that would endanger his child. He said two men from the Mafia had machine-gunned her to death in the bedroom. In the next sentence he said he wanted to tell the truth. He related that Vivian had been selling marijuana and pills from her apartment, that three males, one named Jiggy, had been attempting to get him to sell dope to some rock musicians he employed, and that he had resisted these pressures for about 2 years. Around December 28, 1973, the same men who had pressured him in the past came to their apartment. An argument erupted. The men heard Vivian call from the bedroom. The men entered Vivian's bedroom. Foster heard a shot. As he approached the bedroom, he heard three more shots. He entered the bedroom and ran to Vivian who was lying on the bed. Her head was bleeding. She asked him for help. One of the men put a gun to Foster's neck and threatened that if he did not cooperate, a similar fate would befall him and the children. Defendant left Vivian in the bedroom and locked the door.

Foster next related that about a week to 10 days later, Jiggy called him and said some friends would be over to dispose of the body. Jiggy and another arrived that night, bringing with them a power saw and long-handled ax. Jiggy and his companion amputated Vivian's arms and legs, placed the limbs in green plastic garbage bags, and then moved the torso and bags to the trunk of Foster's car.

At the police station, Foster also spoke with two friends, Shirley Jones and Diane Adams. He expressed his fear for the lives of the children. He told both women that Vivian had been killed by the white Mafia and then told them that Vivian had been killed and dismembered by Jiggy. Diane Adams attempted to locate Jiggy at that time, but was unsuccessful. Later she located Jiggy and spoke to him, but failed to notify the police of her success. Both Shirley and Diane told Officers Savage and Bobko that Jiggy existed and that his girl friend was Yvonne Thorn. The women gave the police a detailed description of Jiggy. After cross-examining Officer Bobko, it came to light that there was a detailed description of Jiggy and the other alleged offenders contained in some hand-written notes of the officer. These notes were not subject to discovery prior to trial.

Investigator Bobko also testified that he had been told that Yvonne Thorn had been a patient at Louise Burg Hospital. He said he checked the hospital records, but found no record of Yvonne Thorn. However, several

hospital records regarding Yvonne Thorn or her children were admitted into evidence. These records contained the name, address, telephone number, and welfare number of Yvonne Thorn.

Diane Adams testified that Bobko told Sandra and Solomon Hudson that Sidney had killed their mother. He also told the children that Sidney was jealous of Vivian and that Vivian was getting in the way. Diane said that the police told her the same things and she responded that there was no reason for those allegations as Sidney and Vivian "got along beautiful." She testified further that Officer Bobko, around the time of Foster's arrest, said Foster was not in his mind and "was sick in the head." Diane Adams also related that she thought Foster was mentally disturbed. She explained that Jiggy and "T-Bone" were the same person.

Evidence was introduced that the defendant had access to a .38 caliber Rohm revolver until December 31, 1973. The defendant, accompanied by Solomon, borrowed the gun approximately 1 week before Christmas 1973 from Edward Thomas. Thomas testified that the defendant wanted to borrow the gun because of harassment in regard to the record company business. The defendant refused to handle the gun and asked Thomas to remove the bullets and put the gun and bullets into an empty camera case. The defendant returned the gun to Thomas in a gift-wrapped package on December 31, 1973, and said "he thought he got the 'dude' and wouldn't be needing the gun any more." Thomas testified that when the gun was returned, it contained only two shells, one being misfired, and four empty chambers. Shortly after the return of the revolver, Thomas gave the gun to another friend who disposed of the gun when chased by the police. Before returning the gun, the defendant allowed Solomon to play with it, but urged him not to tell anyone about the weapon. One day while Solomon was playing with the gun, Vivian arrived home. Foster grabbed the gun and threw it behind the couch.

The day the victim's body was discovered, the coroner's pathologist, Dr. Shalgos, performed an autopsy on the body. The pathologist could not establish the date of death. The testimony revealed that there were four bullet wounds to the head, two entry wounds, and two exit wounds. The pathologist recovered one pellet from the victim's head which was enmeshed in her hair. He testified that at the time he examined the body, the brain was a mushy mass, showing no bullet tracks. In his opinion, the bullets had passed through the brain, causing death. He also stated that a person suffering from this type of wound would not be able to ask for help. On cross-examination, he testified that there was a remote possibility the bullet coursed around the meninges of the brain. With this type of wound, a person would be able to ask for help.

The pellet recovered from the victim's head was identified by a firearms examiner for the Chicago Police Department as a .38 caliber

bullet which had been fired through a bore having eight lands and grooves with a right-hand twist. The firearms examiner testified that due to the condition of the bullet recovered, it would be impossible to determine the particular gun which fired the bullet even if the firing gun was available. He further testified that Rohm revolvers have two sets of class characteristics; those with 8 lands and grooves with a right-hand twist and those with 10 lands and grooves with a right-hand twist. Likewise, at least four other models of revolvers have the class characteristics of eight lands and grooves with a right-hand twist.

Officer Bobko testified at the preliminary hearing in this cause that two pellets were removed from the victim's head by Dr. Shalgos, the pathologist. His police report contains the same data. However, at trial he testified that only one pellet was removed.

Samuel Thomas, a witness for the prosecution, testified on cross-examination that he had seen Vivian Patterson alive on January 4, 1974, and that he had related this information to the assistant State's Attorney. The witness further testified that the assistant State's Attorney told him this was impossible as the autopsy report indicated Vivian had died around December 28 or 29, 1973. The State did not inform the defense of this evidence despite defendant's motion for discovery.

Darnell Glover, a witness for the defense, testified that he spoke with Vivian Patterson on the telephone sometime during the first week of January 1974. Miss Adams testified that she spoke to Vivian Patterson on the telephone on New Year's Day.

Wilbur Richburg and Marvin Morgan, acquaintances of the defendant, testified that Foster offered them $5000 each to help dispose of Vivian Patterson's body. Richburg testified that he met the defendant at a party at Morgan's house several days before New Year's Eve. Morgan stated that he did not have a party at his house, but that he met the defendant at a party at another friend's house on New Year's Eve. Both testified that they left the party with Foster, proceeded to Vivian's apartment, saw Vivian's corpse, but did not see Solomon Hudson or any of the other children. Solomon Hudson testified that he was at home on New Year's Eve.

Richburg and Morgan further testified that the defendant sold an old car for $10, gave them the money and asked them to purchase cardboard barrels. Sometime in the middle of January, late at night, they returned to the apartment with the barrels. The body was dismembered. They were unable to fit the torso in one of the barrels, even after the arms and legs had been amputated. Instead, they wrapped the torso in bed sheets and put the limbs in large plastic bags. Richburg and Morgan dragged the body out of the bedroom to the elevator and then to Foster's car. Richburg and Morgan testified that they were seen with the body on the

elevator. Before returning to the apartment, Foster removed the "license-applied-for" sticker from the windshield. Foster suggested keeping watch at the window for the police. The next morning, Foster gave the trunk key to Richburg who, along with Morgan, placed the limbs in the car trunk. Regarding Vivian's death, Foster told Richburg and Morgan that "T-Bone" had come to the apartment drunk, argued about sex with Vivian, and shot her four times.

Investigator Carroll testified that Diane Adams informed the police either on January 24 or 25, 1974, that the defendant told her in "early December 1973, that Vivian Patterson was moving to California and that he was afraid he would lose Solomon because she wasn't going to take [Foster] with her." Ms. Adams denied making these statements to the police.

Dr. Kermit T. Mehlinger, a noted psychiatrist, testified on behalf of the defense. He testified that at the time the defendant was engaged in acts which constituted concealment of the homicidal death of Vivian Patterson, "He [defendant] was suffering from a transient situational disturbance, acute reaction," and that as a result of such mental disease or defect, the defendant "lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." He further testified that in the presence of overwhelming stress or trauma, his personality structure could undergo such a change that he could be considered psychotic, irrational, and dilutional.

He further testified that in keeping with the basic passive dependent personality structure of the defendant, his timidity, his fear, his inability to assert himself, his proneness to try and run away from any type of stressful situation, and being in such a situation where he was coerced and under the intimidation and threats of three individuals and at the same time witnessing the horror of this crime, this, Mehlinger felt, was sufficient to cause the deteriorated state of his mind so that he was unable to exercise prudence and rational judgment during the period of prolonged ambivalence. Dr. Mehlinger did not believe that amputation of the limbs of the 300-pound victim was a rational way of concealing the body. The fact that Foster removed the "license-applied-for" sticker from the windshield did not change the doctor's opinion of Foster's mental capacity. Mehlinger said Foster told him that "he had an intense fear of any kind of violence." Foster did not tell the doctor that he had obtained a gun prior to Christmas. The doctor said that this fact would not change his opinion, except he opined that Foster showed a little more aggressivity than he would expect.

The defendant's motions for acquittal were denied. Following the return of the verdict, post-trial motions were made by the defense and were denied.

With reference to the first issue, the defendant contends the trial court erroneously denied his motion for judgment of acquittal because the prosecution failed to prove beyond a reasonable doubt the guilt of the defendant for the murder of Vivian Patterson. He further asserts that the State failed to prove he (defendant) was the criminal agency causing the death of the victim. Also, the defense argues that because the evidence was circumstantial and because a reasonable hypothesis consonant with the innocence of the accused exists, the law requires adoption of this hypothesis and the conviction should be reversed.

The State contends that the defendant was proved guilty beyond a reasonable doubt and that the facts proved are inconsistent with defendant's claim of innocence.

■■ The State has the burden of proving beyond a reasonable doubt all of the material and central facts constituting the crime for which the defendant is charged. (*People v. Weinstein* (1966), 35 Ill. 2d 467, 470, 220 N.E.2d 432, 434; *People v. Aldridge* (1974), 20 Ill. App. 3d 1045, 1048, 314 N.E.2d 24, 27.) It is the duty of a court and jury to resolve all of the facts and circumstances in evidence on the theory of innocence, rather than guilt, if that reasonably may be done, and where the entire record leaves a grave and substantial doubt of the guilt of the defendant, the conviction will be reversed. (*People v. Ibom* (1962), 25 Ill. 2d 585, 592, 185 N.E.2d 690, 694.) Furthermore, even though great weight is to be attached to the findings of the trier of fact, including his appraisal of the credibility of the witnesses, it is the duty of this court to carefully review the evidence, and if there is not sufficient evidence to remove all reasonable doubt of defendant's guilt, the conviction will be reversed. *People v. Charleston* (1970), 47 Ill. 2d 19, 22, 264 N.E.2d 199, 201; *People v. Urban* (1949), 403 Ill. 420, 427, 86 N.E.2d 219, 223.

The rule with reference to sufficiency of circumstantial evidence is that it must be of a conclusive nature and tendency leading on a whole to a satisfactory conclusion and produce reasonable and moral certainty that the accused and no one else committed the crime. The guilt of the accused must be so thoroughly established as to exclude every other reasonable hypothesis. *People v. Yaunce* (1941), 378 Ill. 307, 310-11, 38 N.E.2d 30, 31; *People v. Burgard* (1941), 377 Ill. 322, 327, 36 N.E.2d 558, 561; *People v. Sorrells* (1920), 293 Ill. 591, 594, 127 N.E. 651, 653.

In the instant case, the People introduced evidence that the defendant had access to a .38 caliber Rohm revolver until December 31, 1973. In order to link the defendant with the victim's death, it was critical for the State to establish the fact that Vivian Patterson was dead prior to December 31, 1973. However, the evidence does not establish this fact. First, the pathologist could not establish the date of death. Second, the testimony of the State's witnesses differed as to the last time Vivian

Patterson was seen alive, the dates ranging from December 27, 1973 to January 4, 1974. Additionally, two defense witnesses testified that they spoke with the decedent on New Year's Day and during the first week of January 1974.

Furthermore, the State failed to sufficiently connect the murder weapon to the defendant. According to the record, the projectile recovered from the decedent's body was fired from a gun having the class characteristics of eight lands and grooves with a right-hand twist. The Rohm revolver has two types of class characteristics; one with 8 lands and grooves with a right-hand twist and one with 10 lands and grooves with a right-hand twist. The ballistics evidence further showed that there are four other types of revolvers which have class characteristics of eight lands and grooves with a right-hand twist. It is apparent that the gun which the defendant had access to until December 31, 1973, may or may not have fired the .38 caliber bullet recovered from the victim's body.

In support of its argument, the State emphasizes that the defendant conducted himself in such a manner as to evince a clear consciousness of guilt by attempting suicide and by giving conflicting statements of the events surrounding Vivian's death. The suicide attempt was not made closely following the murder. The psychiatrist testified that the defendant took 20 aspirins because the police were drilling him and making belittling and vituperous epithets toward his mother. Even further, the attempt was made around the time when Ms. Adams indicated that the defendant was not in his right mind. In light of these facts, the suicide attempt did not evince a consciousness of guilt on the part of the defendant.

■■ Regarding the defendant's statements, it is true that conflicting statements may be considered as evincing a consciousness of guilt (*People v. Wilson* (1972), 8 Ill. App. 3d 1075, 1079, 291 N.E.2d 270, 273); however, the record indicates that the defendant made conflicting statements not due to guilt, but, rather, out of fear for the children and protectiveness for them. Jiggy had threatened to kill the defendant and the children if the defendant related the events surrounding the death of Vivian Patterson. Psychiatric evidence showed that the defendant was very protective regarding the children, he feared violence, and he was in a panic state following Vivian's death. In light of these facts, it was not unreasonable for the defendant to have given conflicting statements as to other persons committing the murder.

The People also indicate that the defendant's account of the shooting is inconsistent with the facts proved. The defendant said he heard four shots at the time of Vivian's death. The pathologist testified that Vivian had been shot twice through the brain, but further testified that there was a penetration in the back of her chest which could have been caused by a

bullet. Richburg testified that there was a bullet wound in Vivian's arm, but that section of the arm was missing. The record does not indicate any inconsistency on this point.

Additionally, two equally reasonable hypotheses exist in this case; one consonant with the defendant's guilt and one consonant with his innocence. The hypothesis consonant with innocence is that sometime after January 4, 1974, Vivian Patterson was killed by Jiggy who had been dealing in drugs with the victim and two other men. She was shot to death. This hypothesis was not adequately refuted.

We believe that the evidence raises sufficient doubt as to the guilt of the defendant. Furthermore, we cannot ignore the hypothesis consonant with the defendant's innocence and, therefore, we are duty bound to find the defendant innocent on the murder conviction and reverse the judgment of the trial court.

Next, we consider whether the defendant was proved sane at the time of concealment of the homicidal death beyond a reasonable doubt. The Criminal Code defines insanity as follows:

"(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

(b) The terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct." Ill. Rev. Stat. 1973, ch. 38, par. 6—2.

■■ The law presumes all individuals to be sane. (*People v. Moore* (1974), 19 Ill. App. 3d 334, 337, 311 N.E.2d 401, 403.) However, once the defense introduces evidence sufficient to raise a reasonable doubt of the defendant's sanity at the time of the alleged offense, the prosecution must prove his sanity at that time beyond a reasonable doubt. (*People v. Hawkins* (1972), 53 Ill. 2d 181, 186, 290 N.E.2d 231, 233; *People v. Childs* (1972), 51 Ill. 2d 247, 256, 281 N.E.2d 631, 635; *People v. Saylor* (1925), 319 Ill. 205, 212, 149 N.E. 767, 769; *People v. Sims* (1976), 35 Ill. App. 3d 401, 405, 342 N.E.2d 256, 259; *People v. Blair* (1974), 17 Ill. App. 3d 325, 339, 307 N.E.2d 679, 689; *People v. Lono* (1973), 11 Ill. App. 3d 443, 448, 297 N.E.2d 349, 353; see Ill. Rev. Stat. 1973, ch. 38, par. 3—2(a), (b).) Once evidence is introduced which tends to prove insanity and is sufficient to raise a reasonable doubt of sanity at the time of the act, the presumption of sanity ceases. *People v. Skeoch* (1951), 408 Ill. 276, 280, 96 N.E.2d 473, 475.

The State concedes that sufficient evidence was presented by the defense to raise the issue of insanity; however, the State asserts that it has met its burden of proof. The State submits that it was not necessary to

present expert medical testimony in rebuttal, but it may satisfy its burden by other facts in evidence. (*Sims*, at 406.) The People maintain that the following facts clearly show that the defendant appreciated the criminality of his conduct: (1) Foster did not accompany Richburg and Morgan on the elevator when they transported Vivian's body to the car; (2) Foster removed a "license-applied-for" sticker from the car's windshield; and (3) Richburg and Morgan testified that when they returned to the apartment after depositing the body in the trunk, Foster suggested keeping watch at the window for the police.

In his interview with the psychiatrist, Foster explained that he was in a panic state after Vivian was killed and he did not know whether he should call the police. He feared calling the police because he would have to reveal Jiggy's name which could bring harm to him and the children. Out of fear, he told people Vivian was out of town and hired two men to do something with the body. He could not watch anything with respect to the body and could not accompany them down the elevator for the same reason. This testimony combined with the fact that Foster met Richburg and Morgan at the car and waited until the body was in the trunk does not infer, as the People suggest, that Foster was avoiding the possibility of being seen with the body.

The People suggest that removing the "license-applied-for" sticker from the car raises the inference that the defendant appreciated the criminality of his conduct and was attempting to avoid being linked to the crime. The People fail to point out that Foster made no attempt to mar or obliterate the "Cee Fred" sticker on the back of the car or to mar, alter, or obliterate the auto identification numbers. In light of these facts, Foster's removal of the "license-applied-for" sticker bears no significance on the issue of insanity and does not raise the inferences suggested by the State.

■■ With respect to the third factor emphasized by the People, two points should be noted—first, Richburg and Morgan, although accomplices, were not indicted and, therefore, their credibility as witnesses is impeached; second, Foster feared calling the police because he would be forced to reveal Jiggy's name which could bring harm to him and the children. If, in fact, he did suggest keeping watch at the window for the police, the logical inference is that he did so because he feared the probability of revealing Jiggy's name to the police. This fact does not raise an inference of defendant's appreciation for the criminality of his conduct.

■■■ Although we are aware that depravity of character, abandoned habits, or the commission of atrocious crimes are not in themselves evidence of insanity (see *People v. Robinson* (1961), 22 Ill. 2d 162, 167, 174 N.E.2d 820, 823), these factors may be considered. The defendant

lived in the apartment approximately 20 days with the decomposing body locked up in the bedroom. Only then did Richburg and Morgan dispose of the body. Diane Adams testified regarding defendant's sanity at the time he was arrested, such arrest occurring shortly after the concealment of the body. An expert testified regarding defendant's sanity. The testimony, the facts, and the bizarre circumstances surrounding the death of Vivian Patterson were sufficient to raise a reasonable doubt as to defendant's sanity at the time of the alleged offense.

■■ It is true that whether or not the prosecution has satisfied its burden of proof is a question for the trier of fact. (*People v. Dread* (1975), 27 Ill. App. 3d 106, 113, 327 N.E.2d 175, 180; *People v. Jackson* (1969), 116 Ill. App. 2d 304, 314, 253 N.E.2d 527, 532-33.) However, the quantum and nature of proof the State must offer to take the case to a jury varies in different situations and to some degree depends upon the quantum and nature of proof the defendant offers. (*United States v. Westerhausen* (7th Cir. 1960), 283 F.2d 844, 852.) Although it is not necessary for the State to introduce evidence from lay persons and experts regarding the defendant's sanity (*People v. Harrington* (1974), 22 Ill. App. 3d 938, 944, 317 N.E.2d 161, 165) when, as in the instant case, the defendant offered substantial testimony and facts regarding his insanity, and the State offered no lay or expert opinion, and relied on facts in evidence which did not necessarily raise an inference of defendant's appreciation for his criminal conduct, it is clear that the quantum and nature of proof the State offered here was insufficient to sustain the conviction on the charge of concealment of a homicidal death.

The defendant contends that the trial court erred in denying his motion for a new trial for several reasons. First, the defendant argues that the court erred in admitting irrelevant evidence which was prejudicial and inflammatory, thereby denying defendant a fair trial. The defense asserts that the testimony of Solomon Hudson regarding his homosexual contact with defendant was irrelevant with respect to any of the issues in the case. He further asserts that error was committed when certain inflammatory and prejudicial photographs numbered 14, 15, 17, and 20 were admitted.

■■ The testimony of Solomon Hudson was relevant for the purpose of establishing a possible motive. Regarding the photographs, the law is that the admission of a photograph of a deceased person rests within the discretion of the trial court, and where a picture has sufficient probative value, it may be admitted even though the photograph may be gruesome and inflammatory. (*People v. Henenberg* (1973), 55 Ill. 2d 5, 13, 302 N.E.2d 27, 31.) It should be noted that there were no objections to photograph No. 17 and, therefore, defense's objection is waived. The remaining photographs were relevant in establishing facts in issues, *i.e.*, the

number of wounds to the head, and whether or not a portion of the arm was missing. As these photographs had sufficient probative value, the trial court did not abuse its discretion in admitting them.

Defendant contends that the court erred in refusing his offers of proof regarding (1) Diane Adams' conversation with Jiggy wherein Jiggy admitted knowing Vivian Patterson, (2) Ms. Adams' conversation with "Be-Bop" (Jiggy's agent) wherein "Be-Bop" said a drug dealer was out to get him, and (3) the murder of "Be-Bop" and his family shortly after his conversation with Ms. Adams. The State argues that the court's ruling was proper as the testimony was irrelevant.

The defendant in a criminal case is entitled to all reasonable opportunities to present evidence which may tend to create a reasonable doubt as to his guilt, but the evidence must be relevant. (*People v. Cole* (1964), 30 Ill. 2d 375, 380, 196 N.E.2d 691, 694.) We find no error in the trial court's ruling with respect to these offers of proof.

■■ Next, the defendant contends that the trial court erred in denying his motion to suppress. The motion was made orally during trial and after hearing Officer Savage's testimony regarding a search of the decedent's apartment. Following a side-bar, the motion was denied as being untimely.

The defendant relies on section 114—12(c) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1973, ch. 38, 114—12(c)) which provides in pertinent part that the motion shall be made before trial unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion, in that the pretrial discovery answers tendered by the State did not alert him to the fact that an illegal search had been conducted.

The State argues, assuming the defendant has standing to contest a search of the victim's bedroom, that the defendant was clearly aware prior to trial of the grounds upon which a motion to suppress could be founded. The State asserts that the report of the coroner's inquest and police reports which were tendered to the defense prior to trial contained facts which alerted the defense to possible grounds which could be the basis for a motion to suppress. Officer Savage testified at the inquest that the police gained entry to the apartment after being given a pass key by the manager of the building. He further testified that no one was present in the apartment and that the west bedroom was locked. The police reports related the same facts and also related that the police entered the bedroom and observed a bloodstained mattress and sheets. The report also indicated that the police searched the apartment immediately after speaking with various people in the victim's building.

The trial judge ruled that in light of the facts known to the defense prior to trial, an opportunity to present a motion to suppress prior to trial

existed. We find no error with this ruling and find that the motion was untimely. *People v. Colon* (1973), 9 Ill. App. 3d 989, 996, 293 N.E.2d 468, 473.

■■ Also, the defendant argues that the prosecutor suppressed evidence favorable to the defendant which denied him due process of law. The particular evidence claimed to be secreted was the fact that Mr. Samuel Thomas had seen the victim alive after January 1, 1974.

The defendant's rights were not violated because the evidence claimed to have been suppressed was actually heard by the jury.

"The rule of Brady v. Maryland, 373 U S 83, 10 L. Ed. 215, 83 S Ct 1194, arguably applies in three different situations. Each involves the discovery, *after trial,* of information which had been known to the prosecution but unknown to the defense." (Emphasis added.) (*United States v. Agurs* (1976), 427 U.S. 97, 103, 49 L. Ed. 2d 342, 349, 96 S. Ct. 2392, 2400.) If the suppression of evidence is constitutional error, it is because of the character of the evidence, not the character of the prosecutor. 427 U.S. 97, 110, 49 L. Ed. 2d 342, 353, 96 S. Ct. 2392, 2400.

■■ Finally, the defendant contends that the court's refusal to give the following requested instruction was error:

> "If you find that the decedent died after December 31, 1973, then you must find the defendant not guilty of murder."

It is not the province of the court, in an instruction to the jury, to assume the truth of any controverted fact; these matters are proper for argument to the jury, but not instructions. (*People v. Celmars* (1928), 332 Ill. 113, 119, 163 N.E. 421, 424.) The court should only instruct a jury concerning the law to be applied in an given case. Since the tendered instruction did not state a proposition of law, it was properly refused.

As noted earlier, a few days prior to the commencement of this trial, the defense moved the court to appoint experts to examine the defendant regarding his fitness to stand trial, and further requested that the matter of defendant's mental competency be set for a hearing and the issue submitted to a jury for determination. In the motion, Ellis Reid, one of the attorneys for the defendant, stated that he had reasonable cause to believe that the defendant may be so mentally incompetent as to be unable to understand the proceedings against him or properly assist in his own defense. The halfsheet in the case indicates "M/D for B.C.X. and Appointment of Experts—hearing on motion, testimony evidence heard—motion denied." It is apparent from the record that the court did not hold a fitness hearing before a jury as demanded by the defense.

■■ When before or during the trial, facts are brought to the attention of the court, either by suggestion of counsel or the State, or by its own observation, which raise a *bona fide* doubt of the defendant's present competency, a duty devolves upon the court to then cause a competency

hearing to be held as provided by law. (*People v. Korycki* (1970), 45 Ill. 2d 87, 90, 256 N.E.2d 798, 799; *McDowell v. People* (1965), 33 Ill. 2d 121, 123, 210 N.E.2d 533, 534; *People v. Burson* (1957), 11 Ill. 2d 360, 368, 143 N.E.2d 239, 244; *People v. Daliege* (1976), 40 Ill. App. 3d 706, 709, 352 N.E.2d 247, 250.) We believe that the suggestion of mental incompetency raised by defense counsel in this motion sufficiently raised the issue of defendant's fitness to stand trial, and it was error for the trial court to proceed before conducting a fitness hearing pursuant to section 5—2—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1005—2—1). See *Brown v. People* (1956), 8 Ill. 2d 540, 545-46, 134 N.E.2d 760, 762; *cf. People v. Bender* (1963), 27 Ill. 2d 173, 188 N.E.2d 682.

■■ ■ The trial, adjudication, sentence, or execution of a person charged with a criminal offense while incompetent is a violation of due process of law. (*Burson,* at 368.) Even though the defense did not present or argue this issue, except at oral argument, which is generally considered a waiver of such issue, such rule "will not operate to deprive an accused of his constitutional rights of due process. 'The court may, as a matter of grace, in a case involving deprivation of life or liberty, take notice of errors appearing upon the record which deprived the accused of substantial means of enjoying a fair and impartial trial, although no exceptions were preserved or the question is imperfectly present.' [Citations.]" (*Burson,* at 370-71.) In the instant case, the accused's right to due process of law was violated when the trial court failed to hold a competency hearing and, therefore, it is necessary to remand this case for a new trial.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and the cause remanded for a new trial.

Reversed and remanded.

DIERINGER, P. J., concurs.

Mr. JUSTICE LINN, dissenting:

I must respectfully dissent since I believe that the majority, while correctly reciting the standard of review in a criminal case, appears to have disregarded the verdict of guilt rendered by the jury in the instant case and has determined *de novo* whether the evidence sufficiently established the defendant's guilt.

Admittedly, the evidence presented by the State was circumstantial. However, "there is no legal distinction between direct and circumstantial evidence as to the weight and effect thereof." (*People v. Robinson* (1958), 14 Ill. 2d 325, 331, 153 N.E.2d 65, 68.) The majority correctly states that "[w]here the only evidence in a prosecution for homicide is circumstantial evidence the guilt of the accused must be so thoroughly established as to

exclude every other reasonable hypothesis." (*People v. Lewellen* (1969), 43 Ill. 2d 74, 78, 250 N.E.2d 651, 654.) However, this precept should not be interpreted as requiring the prosecution to prove guilt beyond any possibility of a doubt. (*People v. Williams* (1977), 66 Ill. 2d 478, 363 N.E.2d 801; *People v. Murdock* (1971), 48 Ill. 2d 362, 270 N.E.2d 21, *cert. denied* (1971), 404 U.S. 957, 30 L. Ed. 2d 274, 92 S. Ct. 323; *People v. Mackins* (1974), 17 Ill. App. 3d 24, 308 N.E.2d 92, *cert. denied* (1975), 419 U.S. 1111, 42 L. Ed. 2d 808, 95 S. Ct. 786.) Unless there are circumstances contradicting the reasonable inferences and conclusions drawn by the jury from such circumstantial evidence, the determination should not and cannot be disturbed. *People v. Stone* (1977), 46 Ill. App. 3d 729, 361 N.E.2d 330.

Without reciting the State's evidence in this case at great length, it is sufficient to note that defendant had a motive for the murder in that Vivian Patterson had threatened to separate her son from defendant by taking him to California. Defendant was also in possession of a .38-caliber revolver during the time that the murder was committed. It was unnecessary for the jury to make great leaps in logic to conclude that defendant had a reason to murder Vivian Patterson and the means by which to accomplish the crime. That defendant offered his own explanation as to the events does not vitiate the jury's determination that defendant was guilty of the crime. The jury was entitled to disbelieve his explanation and to discount the credibility of his witnesses, especially in view of the fact that he told a different story immediately after his arrest. See *People v. Mackins* (1974), 17 Ill. App. 3d 24, 308 N.E.2d 92.

I believe credence must be given to the reasonable inferences of guilt drawn by the jury. It is perfectly proper for the majority to make an exhaustive search of the record to determine whether the defendant received a fair trial. However, where, as here, the jury's verdict is supported by the evidence, the jury's independent judgment as to the weight to be given the testimony of the witnesses, and the conclusion drawn therefrom as to the defendant's guilt, must be accepted. It is for the jury to ferret out the truth and determine whether or not there exists a reasonable doubt of guilt. See *People v. Stanley* (1976), 44 Ill. App. 3d 85, 358 N.E.2d 69.

The majority has also negated the jury's judgment that defendant was proved sane at the time of concealment of the homicidal death. Again, after correctly reciting the applicable law, the evidence which would support a finding of sanity is rejected.

Specifically, the majority suggests that a connotation favorable to defendant can be gleaned from the fact that he did not accompany his accomplices during the transporting of the victim's body. It seems that if this fact is given its natural meaning—that defendant was fearful of being

seen with the body—it cannot then be argued that defendant's absence was due to his grief for Vivian's death.

It is also maintained that although defendant removed the "license-applied-for" sticker from the car which contained his name and could directly implicate him in the crime, he did not obliterate the car dealer's sticker or the vehicle identification number. While this may be proof which might negate any notion that defendant was a master criminal, it certainly can be implied that defendant was rational and not insane at the time. From the record, the jury could fairly have decided that defendant was sane when he committed the offense, and to reject the testimony of Dr. Mehlinger.

The evidence also indicated that defendant suggested keeping watch at the window for the police. It might be supposed that this was due to fear of discovery of the body and the resulting apprehension of defendant and his accomplices as the perpetrators of the crime. The majority chooses to attribute a more innocent purpose to the defendant's concern, being of the opinion that defendant feared apprehension because it would force him to reveal the true murderer's name, and thereby place Vivian's children in danger.

Finally, the majority is of the opinion that the denial of defendant's pretrial motion for a competency examination and fitness hearing requires reversal. Initially, it should be emphasized that there was a complete failure to preserve this point for review. There was neither a post-trial motion directed to this contention or any argument pertaining to the denial of the motion in defendant's brief on appeal. This issue was raised for the first time at oral argument.

Furthermore, I believe a defendant is not entitled to a fitness hearing until the trial court has notice of facts raising a *bona fide* doubt as to a defendant's fitness to stand trial. (*People v. McCullum* (1977), 66 Ill. 2d 306, 362 N.E.2d 307.) The record in the instant case is entirely devoid of any suggestion as to what facts, if any, might lead the trial court to suppose that there was a *bona fide* doubt as to whether defendant was fit to stand trial. The motion itself merely recited that defense counsel had cause to believe that defendant was not presently fit, and there is no record of what transpired at the hearing on the motion. Consequently, it cannot be said that the trial court abused its discretion in denying a fitness hearing. (See *People v. Nettles* (1975), 32 Ill. App. 3d 1082, 338 N.E.2d 199.) Also, even at oral argument, defense counsel failed to inform this court as to the reasons for his belief that defendant was not fit. I believe that more than an idle assertion is necessary to cause this court to find error in the denial of a fitness hearing.

For these reasons, I would not disturb the jury's decision. Accordingly, I must respectfully dissent from the judgment of this court.